In the Matter of Walter Charles PERRY, Sr., Debtor.

No. BK–65–746.

United States District Court
D. Maine, S. D.
July 20, 1967.

74

John J. Flaherty, Theodore H. Kurtz, William D. Pinansky, Portland, Me., for Beneficial Finance Co., petitioner for Review.

James R. Flaker, Portland, Me., Charles W. Smith, Saco, Me., for Gerald S. Cope, Portland, Me., Temporary Receiver.

George P. Limberis, Bangor, Me., Homer Michalaros, Portland, Me., for debtor.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

Beneficial Finance Co. of Maine petitions for review of an order of the referee in bankruptcy disallowing its unsecured claim in the amount of $402.77 filed in this proceeding for a wage earner plan under the provisions of Chapter XIII of the Bankruptcy Act, 11 U.S.C. §§ 1001–1086 (1964). The basis of the referee's order of disallowance was his determination that the petitioner has failed to prove that its claim is free from usury, within the

meaning of and to the extent required by Section 656(b) of the Bankruptcy Act, 11 U.S.C. § 1056(b) (1964).

The order of the referee is *affirmed* on the opinion of the referee, except to the extent that the referee's analysis of the inter-relationship between the Maine Small Loan Law, 9 M.R.S.A. §§ 3001–3162 (1964), and the Maine Credit Insurance Law, 24 M.R.S.A. §§ 1201–1214 (1964), is inconsistent with the opinion of this Court filed this date In re Richards, 272 F.Supp. 480 (D.Me.1967). This Court also expresses no view as to the quantum of proof required of a creditor by Section 656(b) of the Bankruptcy Act. As the referee correctly found, the evidence submitted by the petitioner in this case was plainly insufficient to satisfy the minimum requirement of Section 656(b). This determination was a sufficient basis for the referee's order and adequately disposes of the present petition for review. There is otherwise no need to elaborate upon the referee's exhaustive and carefully reasoned opinion concerning the meaning and effect of Section 656(b).

It is so ordered.

## OPINION AND ORDER OF REFEREE FOLLOWS:

This opinion and order deals exclusively with the validity of a claim filed in the pending wage earner proceeding by Beneficial Finance Co. of Maine, a licensed Maine small loan company, (hereinafter referred to as Beneficial). Under Section 656(b) of the Bankruptcy Act, the court is explicitly directed to "require proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt was contracted." Section 656 (b) of the Bankruptcy Act of 1898 as amended; 11 U.S.C. § 1056(b). On the basis of the evidentiary material presented to the court, the validity of the claim depends entirely on whether Beneficial has proven that its claim is free from usury, within the meaning and to the extent required by the terms of that section.

## I. *Facts*

The pertinent facts are few and undisputed. Walter Perry, the debtor, filed an original petition for a wage earner plan under Chapter XIII of the Bankruptcy Act on July 29, 1965, listing debts of $3,064.51 and assets of $770.00. Under the plan, Perry proposed to remit $20.00 each week to a court-appointed trustee for the full payment of his debts, but disputed the claims of Beneficial and Public Finance Corporation in his plan and schedules, as being invalid under the Maine law governing small loan transactions.

In addition to being duly notified of the first meeting of creditors and the hearing on the debtor's objection, Beneficial was well aware that, if it filed a claim, the court would require proof of the absence of usury, at the first meeting, in compliance with the provisions of Section 656(b), independent of the debtor's objection. Beneficial, nonetheless, appeared at the first meeting on August 10, 1965, acknowledged the court's demand for proof under Section 656(b), and, in response thereto, simply rested its case by relying exclusively on a proof of claim filed a day earlier, which, as eventually amended, included the original note given by the debtor and his wife and a photostat of the ledger card, showing an unsecured claim in the amount of $402.77. Other than the standard allegation in the proof of claim form which states "That said debt is free from usury as defined by the laws of the place where the debt was contracted," nothing further was submitted with respect to satisfying the requirement of Section 656(b).

According to the information disclosed on the face of the note, the loan was made at South Portland, Maine on May 20, 1965, in the "actual amount" of $403.40, repayable in installments of $23.00 over a period of 24 months. In addition to the maximum amount of interest, the note reflects a "cost" for credit life and disability insurance in the amounts of $7.07 and $11.04, respectively. No additional significant factual

information about the transaction is disclosed other than the notation on the ledger card with respect to a "former loan" made on December 19, 1964, which was "paid" on May 20, 1965, the same date of the loan now under consideration.

No effort was made by the debtor to introduce any evidence in support of his objection.

Of the eleven different creditors listed in the schedules, only five were directly involved at the first meeting of creditors. Beneficial and two other unsecured creditors filed formal proofs of claim accepting the plan. Auto Finance Co. appeared at the first meeting, submitted proof of its unsecured claim in the amount of $792.89, and accepted the plan in writing by filing a formal proof of claim on the following day after the first meeting. The amount of the claims accepting the plan totalled $1,328.77. Public Finance Corporation, however, appeared for the purpose of establishing a secured claim in the amount of $1,218.52 and of noting to the court that it would not submit a written acceptance to the plan, in an endeavor to veto the plan irrespective of the number and amount of acceptances of the unsecured creditors.

Since several complex legal questions were presented, the court took the claim of Beneficial, the matter involving Public Finance Corporation, the determination of the acceptance, appointment of a trustee and confirmation of the plan under advisement for a comprehensive decision. A receiver was appointed to collect and deposit all funds remitted by the debtor pending a final decision on the questions presented. As noted previously, this decision deals only with the validity of the Beneficial claim.

## II. *General Principles of Usury*

▆▆ In the absence of a provision such as Section 656(b), the defeat, avoidance, or adjustment of a usurious contract is governed by the general principles regarding usury. One of the more common remedies available is for the borrower to assert usury as an affirmative defense in any action brought by the lender for collection of the loan.[1] In that event, the burden is on the borrower to prove the existence of usury, since ordinarily usury is not presumed. 91 C.J.S. Usury § 114. More often than not, this imposes an insuperable burden because usury is usually concealed by ingenious contrivances which are beyond the capacity of the typical borrower to detect and establish.

▆ Another aspect of usury which should be noted in advance of any consideration of Section 656(b) is that only the borrower or those in privity with him can attack a usurious loan. 91 C.J.S. Usury §§ 71 and 126. Usury laws are enacted to protect needy borrowers rather than to punish money lenders for extortion. The defense of usury, therefore, is purely personal to the borrower. No strangers to the usurious contract, such as other creditors, can set up the defense of usury, even though they might be affected incidentally by the transaction. 91 C.J.S. Usury §§ 125, 131. Indeed, until Section 70(a) and (c) of the Bankruptcy Act were amended in 1938, there was some doubt that even a trustee in bankruptcy could assert such a defense or recover on rights of action arising upon usury.[2] More directly, a similar doubt still exists as to a trustee under a wage earner plan since he is considered by the small loan industry and others as being an innocuous disbursing agent, without the powers of the standard trustee in bankruptcy.

## III. *Rule of Construction*

Although Section 656(b) obviously marks a drastic departure from these principles, the manner and extent to which this court may invoke that section has provoked a sharp controversy in-

---

1. See generally 91 C.J.S. Usury §§ 71–72, 79–123.

2. Bankruptcy Act, House Committee Print, pp. 189, 191, Committee on the Judiciary, 74th Cong. (May 15, 1935); see also, 40 Harvard Law Review 583.

volving several hundred claims now pending for decision once this question has been finally resolved. Beneficial and other members of the small loan industry have endeavored in this controversy to evade the impact of that section through various maneuvers, the success of which depends on having this court ignore the plain language and construe the provision narrowly by emphasizing legislative oversights and inconsistencies, the effect of which would render the section meaningless and possibly lead to the curtailment or elimination in this jurisdiction of the highly successful wage earner program.[3]

Such an approach to the interpretation of Section 656(b) as urged by that industry distinctly violates the rule of construction recently applied by the U. S. Supreme Court in construing other provisions of Chapter XIII. Perry v. Commerce Loan Co., 383 U.S. 392, 393, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966). In *Perry,* the Supreme Court emphatically stated that it must "give effect to the clear policy underlying Chapter XIII" in construing any of its provisions in order to avoid a construction which would lead to a "futile," "absurd," or "unreasonable" result.[4] The significance of the *Perry* decision is that an *identical* provision contained in Chapters XI and XII was construed differently solely on the basis that the relief of these chapters "represents a wholly different statutory

scheme from wage-earners' extensions." Ibid. at p. 403, 86 S.Ct. at p. 858. As the dissent noted, the majority, therefore, disregarded the literal meaning of seemingly straightforward statutory language in favor of a contrary congressional intent.

In construing Section 656(b), therefore, an extensive review of the legislative history of the Section and Chapter XIII as a whole is imperative under the approach followed by the Supreme Court for an accurate insight as to the purpose, meaning and effect of the provision, if recurring questions of vast importance in wage earner proceedings are to be decided correctly.

### IV.  *Legislative History*

Section 656(b) evolved as one of the indispensable provisions of wage earner proceedings under Chapter XIII of the Bankruptcy Act shortly after the idea of a program for the amortization of personal debts was conceived in 1931, as one of the developments of the Donovan investigation of bankruptcy conditions in New York City in 1929, and the Thacher investigation undertaken by the Department of Justice on a nationwide basis in 1930 and 1931 at the direction of President Hoover.

####   a.  *Donovan Investigation* (1929)

The Donovan inquiry was started in March, 1929, after three New York bar associations were invited to participate

---

**3.** As of December 31, 1966 there were pending in this District 2042 wage earner proceedings resulting in a distribution of over $1 million annually. Maine ranks eighth nationally as to the *volume* of such proceedings filed yearly and third nationally as to the *percentage* of such proceedings filed in relation to all cases commenced by consumers under the Bankruptcy Act.

**4.** As expressed by the court on p. 399, 86 S.Ct. on p. 857 the rule of construction which must be followed is as follows: "Even if a literal reading of these provisions suggested the application of § 14 (c)(5) to extension plans, we would have little hesitation in construing the Act to give effect to the clear policy underlying Chapter XIII. As was said in United States v. American Trucking Assns., 310

U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L. Ed. 1345 (1940): 'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to *absurd* or *futile* results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an *unreasonable* one 'plainly at variance with the policy of the legislation as a whole' *this Court has followed that purpose, rather than the literal words.*' " (Emphasis supplied).

in an investigation ordered by the local federal district court, following disclosures of serious abuses and malpractice in the administration of bankruptcy proceedings in the Southern District of New York. An extensive investigation, involving thousands of witnesses, lengthy public hearings, numerous questionnaires and field studies in six cities, Canada and England, was conducted by Colonel William J. Donovan, as counsel for the joint committee of the bar associations, under the direction of U. S. District Court Judge Thomas D. Thacher. On March 22, 1930, a report was submitted to the court in which the evils disclosed were summarized, important changes in the administrative provisions of the law were recommended, and the advisability of further investigation and study of the substantive provisions of the law was indicated.[5]

In concluding that the philosophy of the bankruptcy act was "wrong" and "should be thoroughly overhauled," Judge Thacher was considerably influenced by his observations of the actual operation of the English bankruptcy system for a period of two months, in November and December 1929, as one phase of the Donovan inquiry.[6] In relation to later developments concerning the revision of the bankruptcy act, this study of the English system was significant in two principal respects: First, it introduced Judge Thacher to a system, which, unlike our own at that time,[7] had for many years stressed rehabilitation rather than liquidation, through appropriate provisions for compositions and extensions for individuals and corporations, as a means of resolving financial problems, for the benefit of both debtors and creditors. Indeed, in this respect, it was learned that the English law had provided a compulsory system since 1883 for the payment of debts owed by wage earners, regulated and conducted under the supervision of the court.[8] Second, especially in relation to the eventual introduction of Section 656(b) into our bankruptcy system, it afforded Judge Thacher the opportunity to observe the application of the Bankruptcy Rules[9] governing the special information required in proofs of claim filed by moneylenders operating under the Moneylenders Act of 1927.

Judge Thacher was so impressed with what he observed in England that, later, in relating his admiration for the English bankruptcy system in an address to the American Bar Association, he remarked:

"I am acutely aware that we cannot transplant the English Statute. It will not fit in all its details into our legal and political system. But if we have the will we should certainly be able to devise the forms of law suit-

5. Administration of Bankrupt Estates, (Report), House Committee Print, 71st Cong. 3rd Sess. (1931), (hereinafter referred to as Donovan Report).

6. A detailed report of this study of the English bankruptcy system is contained in the Donovan Report pp. 169–208; see also, The National Bankruptcy Act, an address by Judge Thacher, 55 Reports of A.B.A. 251 (1930); Strengthening of Procedure in the Judicial System, pp. 49, 101, Sen. Comm. Print, Doc. No. 65, 72nd Cong., 1st Sess. (1932), (hereinafter referred to as Sen.Doc.No.65); testimony of Judge Thacher, Uniform System of Bankruptcy, Hearings on S. 3866, (April 12, June 28, 1932) Sen.Comm. on Jud., 72nd Cong. 1st Sess. (1933), pp. 1043–46 (hereinafter referred to as Joint Hearings 1932).

7. A provision for compositions (but not extensions), primarily adapted for businesses, was provided by Section 12 of the Bankrupcy Act of 1898, but the procedure was too cumbersome and its effectiveness too limited to be of any particular value, especially for wage earners. Perry v. Commerce Loan Co., 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966); see also, brief history of comparative bankruptcy legislation of these two countries, Analysis of H.R. 12889, House Comm. Print pp. 36, 100, 74th Cong., 2nd Sess. (1936); Donovan Report pp. 169–208.

8. See, Holm-Nielson, The Problem of Wage Earner Bankruptcies and its English Solution, 9 J.N.A.R.B. 103; Sen.Doc. No. 65, pp. 49, 101.

9. England, Bankruptcy Rules, 1952, Rules 165 and 251.

able to our own conditions, through which similar principles may be brought into operation to produce results comparable to those accomplished in England." [10]

b. *Thacher Investigation* (1930–31)

Immediately upon the conclusion of the Donovan investigation, therefore, Judge Thacher, who had resigned from the bench to accept the appointment of solicitor general of the United States in June, 1930, convinced President Hoover of the necessity of a national investigation of the administration of bankruptcy proceedings, in the hope of eventually achieving the "[r]adical changes" obviously required in the bankruptcy law.[11] Accordingly, on July 29, 1930, President Hoover announced:

"I have authorized the attorney general to undertake an exhaustive investigation into the whole question of bankruptcy law and practice. It will be a most extensive and vigorous investigation. The work will be under the direction of the Solicitor General, and he will be assisted by the Department of Commerce.

"The losses through bankruptcy in the last five years exceed $3,000,000,000 and are now averaging $750,000,000 per annum. The purpose of the investigation is, of course, to propose to Congress some essential reforms in the bankruptcy law and practice." [12]

Once the investigation was commenced, much of the actual labor of gathering all available data relating to the operation of the law and the administration of estates thereunder was performed by Mr. Lloyd K. Garrison, a member of the original staff of associate attorneys in the Donovan inquiry, who was again called into service as a special assistant to work under the Solicitor General. In this endeavor, the facilities for obtaining factual data from numerous individuals and organizations, such as the National Association of Credit Men, the American Bar Association, the National Retail Credit Association, the National Association of Manufacturers, the Chamber of Commerce, judges, referees and clerks of the United States courts, were placed at the disposal of the Department.

One of the principal conclusions of this extensive investigation, just as the Donovan inquiry had found, was that the bankruptcy act had failed in its primary purpose of being an effective medium of distribution of assets to creditors.[13] One reason for this was the fact that over half of the cases were filed by wage earners, nearly all of whom had no assets above exemptions.[14]

In studying this problem, the investigators learned that most wage earners were anxious to pay their debts but were often forced to file bankruptcy as a last resort, usually for the purpose of protecting their only source of livelihood when threatened by a wage attachment or garnishment.[15] As evidence of the

---

10. 55 Reports of A.B.A. pp. 251–258 (1930).

11. Donovan Report p. 233; for an excellent summary of the events demonstrating that Judge Thacher was solely responsible for instigating the national investigation, see Remarks of Mr. Montgomery, 7 J.N.A.R.B. pp. 57–60.

12. Sen.Doc.No.65, p. 1.

13. See Sen.Doc.No.65, pp. 6–10, for detailed statistics in support of this conclusion. Also, Memorandum Regarding Certain Proposed Amendments to the Bankruptcy Act Prepared by Thacher, Vol. 8 Atty. Gen'l's. Report (1941) pp. 1–20.

14. Sen.Doc.No.65, p. 8, citing statistics showing that 94.36% of all cases filed by wage earners had assets of less than $100.

15. For an extensive treatment of the problems encountered by wage earners in dealing with "loan sharks," manifesting an intense desire on the part of the solicitor general and Mr. Garrison to produce appropriate corrective measures, see, Sen.Doc.No.65, pp. 77–85; Materials on Causes of Bankruptcy, Discharges, Chapter XI, Chapter XIII, Miscellaneous, Vol. 4, Atty. Gen'l's. Comm. on Bkcy.Adm., (1940) under section entitled Wage Earners (hereinafter referred to

tremendous effort to stave off creditors and avoid the stigma of bankruptcy, it was found that wage earners borrowed enormous sums of money from small loan companies. It was estimated that in 1929 wage earners borrowed about $2,125,000,000 from such sources, nearly one-half of which was used to consolidate their indebtedness into a single account. In this effort, which according to Mr. Garrison was a "perfectly staggering" burden, wage earners were charged rates which varied from 24 to 42 per cent per annum by licensed lenders, and as high as 480 per cent if money was borrowed from unlicensed lenders, as more often happened. Moreover, various studies of actual case histories disclosed that a substantial majority of the wage earners were indebted simultaneously to an average of four small loan companies and often paid as much as 20% of their earnings for interest alone. It is little wonder, therefore, that Mr. Garrison noted in testimony before congressional subcommittees on bankruptcy that by running to "loan sharks," a wage earner was only "getting his neck still further in the noose." [16]

Many wage earners, nevertheless, even though hopelessly insolvent, still endeavored to avoid bankruptcy by paying their bills, through private amortization programs administered by employers, retail credit bureaus and other organizations. The solicitor general and Mr. Garrison were amazed and very much impressed by these plans since most of them "worked pretty well except where minority creditors persisted in levying garnishments." [17] As an example of what could be accomplished if creditors cooperated, the report on this investigation cited the success attained by the American Amortization Co. of Chicago, which, in an experiment in 1929–31, was able to pay all creditors in full in over 85% of the 600 cases it handled. This was done, the report stressed, at a cost of less than five per cent of the debts involved, in cases where the wage earners would have paid nothing if they had been forced into bankruptcy.

Minority creditors who refused to cooperate in private amortization programs were in a strong bargaining position for special treatment since no remedy existed under state or federal law by which they could be controlled. One way or another, therefore, wage earners usually were at the mercy of "loan sharks," not only to their great personal detriment but also to the harm of the many other creditors whose claims were lost in the inevitable, barren bankruptcy proceeding.[18]

as Vol. 4, Atty. Gen'l's. Report, Wage Earners); Joint Hearings 1932 pp. 575–582 (Garrison's testimony) and pp. 1039–1057 (Thacher's testimony) one portion of which at p. 1041 is as follows: "Those facts demonstrate the desire upon the part of the wage earners to stave off bankruptcy, not to take the bankruptcy route, as it is called, with shame, but to find an opportunity through this dangerous process of borrowing money at these usurious rates, to somehow get themselves out of the box."

16. Joint Hearings 1932 p. 576; see also Detection of Usurious Claims and Illegal Charges in Wage Earner Bankruptcies, a pamphlet prepared by experts on small loan law, published by the Conference on Personal Finance Law (1943), in which on p. 8 it is stated: "But, in the majority of cases, there follows a period during which his indebtedness increases to the point where the interest alone exceeds his capacity to pay and he is unable to reduce the principal."

17. Joint Hearings 1932 p. 1041. For greater detail about these private arrangements see particularly memorandum prepared by Mr. Garrison for the Solicitor General in Vol. 4, Atty. Gen'l's. Report, Wage Earners.

18. Joint Hearings 1932 p. 1041 where the solicitor general stated: "To a man upon whose honesty and integrity the small merchant must depend, if he is going to supply his needs, and those are the people who suffer, the small merchants, the retail dealers, *not the money lender*. He lives on the man. He threatens his job, and he removes him from his job if he does not pay." (Emphasis supplied). See also, testimony of Mr. Teitelbaum as to difficulties encountered by the American Amortization Co. with "one or two or three creditors, who insisted

### c. *Hastings-Michener Bill* (1932)

In view of this deplorable state of affairs, therefore, the solicitor general concluded that amendments to the bankruptcy act were needed "that will do justice to creditors on the one hand, and on the other, will afford to financially embarrassed wage earners a form of constructive relief from the staggering burdens of loans and interest charges which they are now carrying in an attempt to save themselves from the stigma of the only proceeding now available to them." [19] It was envisioned that an amortization program adminstered under the supervision of the court could prevent financially distressed individuals from becoming victims of "loan sharks" in that 1) they would have an inexpensive alternative to borrowing from small loan companies, for the purpose of paying their creditors; [20] and, 2) the running of interest on any outstanding small loans would stop upon the filing of the amortization petition. [21]

Accordingly, as one of a series of revolutionary revisions to the bankruptcy law, a program for the amortization of debts owed by wage earners was included in the tentative draft prepared by the solicitor general and his assistant, Mr. Lloyd Garrison, in the summer of 1931. Under a new chapter entitled, "Chapter VIII. Provisions for the Relief of Debtors," Section 75 provided a simple procedure by which a wage earner could amortize his debts by periodical payments over a period of time not to exceed two years. It was a short section, more in the form of an outline, without any reference to such details as the proof and allowance of claims, and, in particular, to any requirement of having creditors prove that their claims were free from usury.

Realizing that the draft was not a finished version of what was needed to improve the bankruptcy law, the solicitor general had the proposed bill introduced in the first session of the 72nd Congress in the spring of 1932, as the Hastings-Michener Bill, [22] with the intention of provoking discussion from which constructive changes and modifications might be gained. It was thought that in that way an agreement might be reached "upon a measure which would adequately meet the evils which had been disclosed as a result of the investigation." [23]

Obviously due to the importance attached to the bill, a hearing was immediately scheduled before a joint meeting of the congressional judiciary subcommittees on bankruptcy, beginning on April 12, 1932. During the course of

---

upon their whole pound of flesh immediately and would not defer the payment of their obligations in any way." Hearing on H.R. 6439, p. 65, H.Comm. on Jud. 75th Cong. 1st Sess. (1937).

19. Sen.Doc.No.65, p. 85.

20. In a memorandum by Lloyd Garrison to the Solicitor General concerning bankruptcy dated June 19, 1931, Mr. Garrison stated in this regard: "(c) Still more important, if the plan could be given sufficient publicity by retail credit associations and social service agencies, debtors might learn to take advantage of it without first getting up to their necks with the loan sharks. The honest debtor who wants to pay invariably runs to the loan shark to stave off creditors, and quite frequently goes to a second shark to pay interest to the first, a third to pay the second, and so on. The Amortization Company showed me some cases where the debtor was involved with as many as

a dozen loan companies, and our bankruptcy-case histories contain many similar instances. If when the debtor first got behind he could be induced to go to the Referee instead of to the loan shark, incalculable good would result." Vol. 4, Atty. Gen'l's. Report, Wage Earners.

21. In the same memorandum Mr. Garrison also noted as follows: "(d) If, however, he did get involved with the sharks, the filing of the amortization petition would stop the running of interest and effect a great saving. The reputable loan companies ought not to object to this, for the alternative to amortization is bankruptcy, with everything wiped out, principal and interest together."

22. H.R. 9968 introduced by Congressman Michener on March 1, 1932 in 72nd Cong.; S. 3866 introduced by Senator Hastings on February 29, 1932.

23. 7 J.N.A.R.B. p. 60; see also Id. p. 69.

the next few months, until final adjournment on June 28, 1932, many witnesses testified and numerous statements were submitted on the proposals. Principal spokesmen for the strongly endorsed proposed legislation were Mr. Lloyd Garrison, who attended nearly every session, and the solicitor general, who completed the hearing as the last witness by presenting a summary of the proposals, the objectives, and reasons for the recommended revisions.[24]

Any hope for an immediate agreement on the revisions, however, was dashed by the vigorous opposition of the American Bar Association, the Commercial Law League, a number of referees in bankruptcy and others actively connected with bankruptcy proceedings. While some changes in the law were expected as an outcome of the investigation, the extensive revisions came as a "distinct shock" to those familiar with the subject.[25] As one referee noted: "The changes proposed were indeed revolutionary, going, as they did, to the very fundamental principles of bankruptcy administration, creating a bureaucratic form of administration and undoubtedly throwing into discard, so to speak, much if not most of the judicial interpretation which has been built up over a third of a century." In addition to characterizing the new law as being "fanciful," "harmful," "undesirable," and "unnecessary," he remarked that "[i]t is simply an experimental excrescence on the Bankruptcy Act which will have to be, and in my opinion, will be very soon removed."[26]

But, in spite of this broad attack, very little criticism was directed specifically against the proposal for the amortization of personal debts by those opposed to a sweeping revision of the bankruptcy law. Other than stressing that there was little need or demand for such a program under federal law, their principal concern was that it would convert the bankruptcy courts into "collection agencies for the creditors of wage earners."[27]

A more serious charge was made by a referee in Bankruptcy from Alabama, who, by virtue of his experience, was more familiar with the plight of the financially burdened debtor than most other opponents, in implying that debtors would be compelled under the pending measure to pay illegal or unconscionable claims. In rather blunt terms, Referee Dryer remarked:

"This bill, so far as the wage earner is concerned, is nothing more or less than this, in effect: a wage earner can not get his discharge. I do not care what your provisions and exceptions are, the main purpose of that bill is not to let a wage earner get his discharge if within two years he can pay his bills out of his future earnings. That is not entirely involuntary, because he need not come in, but it is saying, if you come in you are going into *slavery;* either go into *servitude,* or stay out of the bankruptcy court. *Enactment of this part of the bill will delight the loan-shark, the cheap-clothes dealer and the high-powered installment payment plan houses. We know they can not pay such creditors—we people who have lived with these laborers."* [28] (Emphasis supplied).

Remarkably enough, the members of the subcommittees and Mr. Garrison had detected this crucial defect in the proposal somewhat earlier in the course of a discussion about the exorbitant amount of interest debtors were often obliged to pay to "loan-sharks." In evaluating the substance of this criticism, they recognized that it would be hopeless to expect a debtor, afflicted by abject poverty, distress and misery, retarded by ignorance of his legal rights and, worse still, often inadequately represented by counsel, to bear the formidable burden of detecting and proving the existence of

24. Joint Hearings 1932, pp. 1039–1057.

25. 7 J.N.A.R.B. 98; see also Joint Hearings, 1932, pp. 507–8, 558, 617–624, 880, 886, and 1027 for testimony of those opposed to the proposed revision.

26. 7 J.N.A.R.B. p. 100.

27. Joint Hearings 1932 pp. 507–508 and 558.

28. Joint Hearings 1932 p. 622.

usury. Once this point was realized, it became immediately apparent that no proposal intended for the relief of debtors could or should be enacted unless it contained some provision for the appropriate disposition of illegal or unconscionable claims.

An indication of a solution, which eventually was translated into terms comparable to the provisions of Section 656(b), was revealed by Congressman McKeown in this testimony at the joint hearings:

> "MR. GARRISON: Yes, sir. That would represent a maximum to wage earners of about 13 per cent on his money. When you consider the interest rates they pay to loan sharks, you will find a great difference.
>
> "REPRESENTATIVE McKEOWN: Is there objection to some provision in this bill whereby usurious interest could be purged from the claim? *In other words, could the claimant be required to purge the claim of that enormous amount of interest?* They have lobbied in State legislatures to prevent any State legislation along that line.
>
> "SENATOR HASTINGS: I think that is a fine suggestion.
>
> "MR. GARRISON: Yes, it is.
>
> "REPRESENTATIVE McKEOWN: They must come into court with clean hands."[29] (Emphasis supplied).

#### d. *Origin of Section 656(b)*

As novel as this suggestion appeared, the basic concept of shifting the burden to the lender as a means of detecting usury was at this time an integral part of the English law governing the operations of moneylenders.[30] Under Section 10 of the Moneylenders Act of 1927, it is *presumed* that the interest charged is excessive and the transaction is harsh and unconscionable, if the interest charged exceeds forty-eight per cent annually *unless the contrary is proved by the lender*. In order that an excessive charge may be detected, Section 9 provides that a proof of debt due a moneylender cannot "be admitted for any purposes of the Bankruptcy Act, 1914, unless the affidavit verifying the debt is accompanied by a statement showing in detail the particulars of the loan transaction such as 1) all sums loaned and the date of each advance; 2) all sums paid and the date of payment; 3) the proportion of the claim which is principal and that which is interest; and, 4) a statement of the amount of interest which would be due if calculated at five per cent per annum.[31]

The effect of Section 10 is to shift the onus of proof to the lender. Reading Trust, Ltd. v. Spero (1930) 1 K.B. 492. In interpreting that section, decisions soon established that the responsibility for invoking that power is lodged *exclusively* in the court. Parkfield Trust, Ltd. v. Dent, (1931) 2 K.B. 579; (1931) All E.R. 720; Mills Conduit Investment, Ltd. v. Leslie, (1932) 1 K.B. 233, C.A.; (1932) All E.R. 442. In *Parkfield*, the court decided that a *default judgment* could not be entered against the borrower unless the lender satisfies the court that the interest charged is not excessive and that the transaction is not harsh and unconscionable. But more important, such proof is required even if the borrower *consents* to judgment for the full amount

---

29. Joint Hearings 1932 p. 580.

30. Moneylenders Act of 1927; see, 27 Halbury's Law of England (3rd ed.), pp. 36–40, 42–44; 16 Halbury's Statutes of England, (2nd ed.), pp. 390–392; 8 Holdsworth, A History of English Law (2nd ed.), pp. 100–113; Stone and Meston's, Law Relating to Moneylenders (4th ed.); Orchard and May, Moneylending in Great Britain, Russell Sage Foundation (N.Y. 1933) pp. 93–135.

31. In order to carry into effect the objectives of this section, Rule 251 of the English Bankruptcy Rules, 1952, provides: "The affidavit of proof of debt of a creditor who is a licensed moneylender shall have endorsed upon or annexed to it a statement setting out in detail the particulars required by Section 9(2) of the Moneylenders Act, 1927."

claimed by the lender. Mills Conduit Investment, Ltd. v. Leslie, supra.

On this latter point, Lord Harworth in a unanimous decision wrote on page 239:

"It has been argued that the controversy has been proved, and the presumption rebutted, by reason of the consent given by Denholm that judgment should be signed against him, that it was the duty of the Master to give effect to that consent and give the appellants leave to sign judgment subject only to the condition of a stay of execution until May 4. We do not take that view. The consent of the parties cannot relax the duty or lessen the powers of the Court * * * Although the parties have made their own agreement, it is still the duty of the Court to observe, respect, and carry out the direction in s. 10, and to presume that in this case the interest is excessive and the transaction harsh and unconscionable, until the contrary is proved. It cannot be that the sanction and authority of the Court must be given to a transaction prima facie harsh and unconscionable merely because the defendant has given his consent to the adoption of a particular course. The consent of the defendant is not of itself sufficient proof to the contrary to rebut the presumption with which in the circumstances specified in s. 10 the Court is directed to approach the case. *The duty imposed upon the Court still remains notwithstanding any consent between the parties.*" (Emphasis supplied).

### e. *Enactment of Section 656(b), (1933)*

In revising the amortization program after the joint hearings, the solicitor general,[32] who, as previously noted, had observed the actual operation of the English bankruptcy system for two months in 1929 as one phase of the Donovan inquiry, incorporated the principles of Sections 9 and 10 of the Moneylenders Act of 1927 and the bankruptcy rule governing the special information required in proofs of claim into a new section for the relief of individual debtors, as an answer to the objections about compelling wage earners to pay illegal or unconscionable claims. This was accomplished by including a requirement identical in substance to the terms of Section 656(b) in the provision for compositions and extensions under Section 74,[33] which, along with relief provisions for farmers (Section 75) and railroads (Section 77),

32. References to the history of the development of Section 74, as well as the other relief chapters enacted in 1933, showing the extensive involvement of the Solicitor General see, H. Report No. 1897, 72nd Cong. 2nd Sess. (1933); S. Report No. 1215, 72nd Cong. 2nd Sess. (1933); 7 J.N.A.R.B. pp. 85–86, 98–100, 157–158; 12 J.N.A.R.B. pp. 124–132; Amending the Bankruptcy Act—Criticisms and Suggestions Relating to H.R. 14359 and S. 5551, Amending the Bankruptcy Act, Senate Committee Print, 72nd Congress 2nd Session (1933) in which on p. 1 it is stated: "It is understood that the bill, H.R. 14359, as passed by the House, was based in large measure, upon drafts proposed by the Solicitor General."

33. This provision appeared for the first time in H.R. 13955, a bill introduced by Congressman McKeown on December 29, 1932, as one of the provisions of Section 74 dealing with compositions and extensions under "Chapter VIII, Provisions for the Relief of Debtors." As Section 74f(4), it read: "The court shall require proof from each creditor filing a claim that such claim is free from usury." It also appeared in a substantially identical bill filed by Congressman McKeown on January 10, 1933, as H.R. 14133. In commenting on these bills, Congressman McKeown remarked: "This whole legislation will relieve the present tension. It covers debtor individuals, debtor railroads, and other debtor corporations. *It is similar to legislation that has been in effect for half a century in England, where all the trouble between debtors and creditors has been settled by deeds of arrangement.*" 7 J.N.A.R.B. 86 (Jan., 1933). (Emphasis supplied). It finally appeared in H.R. 14359 as Section 74(g) (4), introduced by Congressman Sumners on January 21, 1933, in which the relief for individuals, farmers and railroads was consolidated in a single bill in order to assure rapid passage through Congress.

was enacted as emergency legislation on March 3, 1933, in response to an urgent plea from the president for relief necessitated by the prevailing severe economic conditions.[34] In this revolutionary legislation, subdivision (g) (4) of Section 74 provided: "In application for extensions the court shall require proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt is contracted." [35]

Now, therefore, in addition to preventing wage garnishments, repossession of property; affording an inexpensive method for the payment of debts, and stopping the payment of "staggering" interest, Section 74 provided another vehicle to relieve financially laden debtors from the

ravages of "loan-sharks," by requiring lenders to prove the absence of usury, which, it was hoped, would be a further inducement to debtors to resolve their financial problems through the process of Section 74, as well as allay the qualms entertained by many referees about acting as agencies for the collection of illegal and unconscionable claims.

### f. Revisions by the National Bankruptcy Conference

Immediately after the enactment of the emergency measures in 1933, work began on more comprehensive revisions to the bankruptcy law, performed principally by the National Bankruptcy Conference, an organization formed by bankruptcy specialists opposed to the passage of the Hastings-Michener Bill.[36] Over the

34. In a message delivered on January 11, 1933, President Hoover summarized the fundamental objectives of an amortization program for wage earners by noting in part: "Under existing law, even where majorities of the creditors desire to arrange fair and equitable readjustments with their debtors, their plans may not be consummated without prohibitive delay and expense, usually attended by the obstruction of minority creditors who oppose such settlements in the hope that the fear of ruinous liquidation will induce the immediate settlement of their claims.
    "The proposals to amend the bankruptcy act by providing for the relief of debtors who seek the protection of the court for the purpose of readjusting their affairs with their creditors carry no stigma of an adjudication in bankruptcy, and are designed to extend the protection of the court to the debtor and his property, while an opportunity is afforded the debtor and a majority of his creditors to arrange an equitable settlement of his affairs, which upon approval of the court will become binding upon minority creditors. Under such process it should be possible to avoid destructive liquidation through the composition and extension of individual indebtedness and the reorganization of corporations, with the full protection of the court extended to the rights and interests of creditors and debtors alike. The law should encourage and facilitate such readjustments in proceedings which do not consume the estate in long and wasteful receiverships." H.Doc. No. 522 p. 2, 72nd Cong. 2nd Sess. (1933).

35. An identical requirement was included in Section 75 dealing with relief for farmers. Section 75(i)(3).

36. During the course of the joint hearings, the opponents were invited by Senator Hastings, chairman of the Senate judiciary subcommittee on bankruptcy, to submit alternative proposals designed to resolve the evils disclosed by the Donovan and Thacher reports, which they would be willing to sponsor. Joint Hearings 1932, pp. 514-515. In response to this "challenge," Robert A. B. Cook, one of the opponents appearing at the joint hearing as a representative of the Commercial Law League, arranged a meeting in June, 1932 of a small group of volunteers (Jacob M. Lashly, St. Louis, of the American Bar Association; Prof. James A. McLaughlin, of Harvard Law School; Reuben Hunt, San Francisco, a specialist in the practice of bankruptcy law; Referee Carl D. Friebolin, Cleveland, then president of the National Association of Referees in Bankruptcy; and, Referee Paul H. King, Detroit, chairman of the Committee on Uniformity of Practice of the Referees' Association) to develop a practicable draft. In addition to organizing the Conference, a "short bill," also known as the "Boston draft," was prepared to meet the "immediate necessities" of the bankruptcy system. A second conference was held in St. Louis in September, 1932, to perfect this draft but Congress' concern with "relief" legislation prevented an early consideration of the new proposal. See, 7 J.N.A.R.B. 98 (April, 1933); 12 J.N.A.R.B. p. 124 (July, 1938); Bankruptcy Act, p. III,

course of three years, five extensive drafts were prepared, the last of which was introduced in Congress on January 20, 1936, by Congressman Chandler as H. R. 10382. In this prodigious endeavor, the Conference displayed its insensitivity or indifference [37] to the needs of distressed wage earners by not giving any consideration to a section dealing with relief for them. For one reason, little need was seen for such a program, since experience had shown that Section 74 was rarely employed by wage earners, except in the South. As another reason, the Conference believed that a separate provision for wage earners was "made unnecessary by the proposed amendment to Section 12," referring to provisions designed principally for the rehabilitation of commercial concerns through arrangements and corporate reorganizations. Not too surprisingly, therefore, Section 74 was entirely eliminated. Moreover, in another regressive move, the necessity for proving the absence of usury, as required under Section 74g(4), was discarded by the Conference in recasting the confirmation provision of Section 12, explaining that the "[r]equirement of such a nega-

tive is objectionable; affirmatively, the defense of usury is obviously available to the debtors." [38]

Nevertheless, the plight of the wage earner did not go unnoticed. Others, operating under the same pressures which led to the enactment of Section 74 in the first instance, continually sought a more effective means for alleviating the hardships encountered by the poor during the severe economic depression. In the very next session of Congress after the enactment of Section 74, beginning as early as January, 1934, and in each session thereafter, proposed legislation for the specific relief of wage earners was introduced in Congress.

### g. Necessity and Feasibility of Section 656(b) Demonstrated by Referee Nesbit

But, more than anything else, the necessity and feasibility of a program for the amortization of personal debts was dramatically demonstrated by an exceptional administration of wage earner proceedings in Birmingham, Alabama, under a very liberal interpretation of Section 74.[39] Immediately after the en-

Committee Print, Committee on the Judiciary, House of Representatives, 74th Cong. (May 15, 1935).

37. In a recent interview, Professor MacLachlan (McLaughlin), a charter member of the National Bankruptcy Conference, acknowledged that the "Bankruptcy Act was drawn up to meet the needs of ailing businessmen; the relief for consumers or wage owners (sic) was mostly incidental." The Writ, p. 4, (The Washington University School of Law, September, 1966). Now, some 30 years later, Professor MacLachlan concedes that a provision for suspended or conditional discharges, as proposed in the Hastings-Michener Bill, "demands renewed consideration in the light of mushrooming wage-earner bankruptcies and the dawning recognition that it is a worthy objective for law to sustain the character of citizens rather than complacently collaborate in their demoralization." MacLachlan, Puritanical Therapy for Wage Earners, 68 Comm.L.J. 87, 90 (April, 1963).

38. Bankruptcy Act, House Committee Print, p. 44, Committee on the Judiciary, 74th Cong. (May 15, 1935). Since the

thinking of the Conference was predominated by commercial rather than noncommercial considerations, such action was not wholly unwarranted. Basically, usury laws are enacted for the protection of needy borrowers. Indeed, in some jurisdictions, there are statutes prohibiting corporations from interposing the defense of usury apparently on the basis that they can bargain and protect themselves adequately. See 91 C.J.S. Usury § 71–75; The Treatment of Usury in Bankruptcy Proceedings, 28 J.N.A.R.B. 122 (Oct., 1954). Moreover, the Conference may have been influenced by its clarification of the law in amending Section 70 to provide the trustee with the right to assert the personal defense of usury, as well as to recover on rights of action arising upon usury. Bankruptcy Act Committee Print, pp. 189, 191, Committee on the Judiciary, House of Representatives, 74th Congress (May 15, 1935); see also, 40 Harvard Law Review 583.

39. A comprehensive description of the administration of wage earner proceedings by Referee Valentine Nesbit under Section 74 may be found in his testimony be-

actment of that section, Judge Grubb in April, 1933, appointed an attorney, named Valentine Nesbit, as special referee to adapt the provisions of the new law to a system for the financial rehabilitation of wage earners. In a vigorous manner, occasionally employing "strong-arm" methods,[40] Referee Nesbit succeeded in convincing recalcitrant creditors and harassed debtors that a program for the periodical payment of valid debts, administered under the supervision of the bankruptcy court, was for their mutual benefit. Once the debtors realized that they would be effectively protected primarily against the oppressive actions of "loan sharks," the volume of such proceedings increased sharply.[41] By the end of 1937, 2600 cases had been filed, with $314,383.30 distributed to 814 different creditors. Of this number, only 343 proceedings were dismissed for various reasons. In all other cases, representing well over eighty-five per cent, the debtors paid their claims as filed and allowed in full.

Inevitably, such an extraordinary administration soon came to the attention of those interested in developing some kind of program enabling improvident debtors to satisfy the pressing demands of creditors in an honorable fashion, without harassment or fear of economic strangulation through garnishments and repossessions. One of these persons was Congressman Chandler. In the interest of obtaining the benefit of Referee Nesbit's vast experience in such matters, Congressman Chandler sent him H. R. 6140,[42] a bill providing for the amortization of debts of wage earners, introduced by the congressman on February 25, 1935, in response to a national need indicated by his experience as attorney for the City of Memphis, Tennessee, in connection with a municipal debt-pooling arrangement.[43]

### h. *Revision of H. R. 6140 to Include Section 656(b)*

Referee Nesbit, in extensively revising H. R. 6140, produced a remarkably comprehensive draft, which, when introduced by Congressman Chandler on February 17, 1936, as H. R. 11219, formed the basic framework of Chapter XIII as it exists today. Obviously conditioned by his observations of ruthless practices, he featured provisions strengthening the powers of the court, designed to deal effectively with difficulties often encountered with rapacious moneylenders and other unscrupulous creditors. Of singular importance was the inclusion of a provision comparable to the terms of Section 656(b). As embodied in the new measure as Section 74a(i) (4), this provision read as follows: "In proposed compositions or in applications for ex-

---

fore the congressional subcommittees on bankruptcy: Report of Hearing on the Chandler Bill (H.R. 11219), pp. 1–14, (March 11, 1936), pamphlet prepared and published by the National Retail Credit Association as documented in 16 Atty. Gen'l's. Report (1941), Part 2, No. 13 (hereinafter referred to as Hearing on H.R. 11219) ; Hearings on H.R. 6439, pp. 247–264 (June 4, 1937), House Com. on Jud., 75th Cong., 1st Sess. (1937) (hereinafter referred to as Hearings on H.R. 6439); Hearings on H.R. 8046 pp. 65–72, (Jan. 19, 1938) Sen.Subcom. of the Comm. on Jud., 75th Cong., 2nd Sess. (hereinafter referred to as Hearings on H.R. 8046).

40. Hearings on H.R. 11219, p. 11.

41. Hearings on H.R. 6439, p. 261 where Referee Nesbit stated: "No, sir; I think it is regarded—I think the debtors regard it as their court, and it is known as the debtors' court." See also, Hearings on H.R. 8046, pp. 65, 71.

42. This bill was prepared by R. Preston Shealey, Washington counsel of the National Retail Credit Association, an organization long active in sponsoring legislation for an amortization program. *Letter* from Congressman Chandler, dated August 10, 1938, The Credit World, p. 31 (September, 1938). Also for an explanation as to how Congressman Chandler and the National Retail Credit Association became aware of Referee Nesbit's administration and obtained his services to rewrite H.R. 6140, see Legislative Activities and Recommendations, The Credit World, p. 24 (September, 1936).

43. Hearing on H.R. 11219, p. 1.

tensions of time within which to pay his debts, the court shall require proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt is contracted."

In his testimony at the hearing on H. R. 11219 on March 11, 1936, Referee Nesbit emphasized the necessity of such a provision by citing his experience with an identical requirement under Section 74, in disallowing or modifying usurious claims, to the extent permitted under the laws of Alabama.[44] When questioned by Professor McLaughlin about his experience "with what are commonly known as loan sharks," Referee Nesbit replied:

"MR. NESBIT: At first I had considerable difficulty with the loan sharks, because when the loan shark files his claim in court *I would not allow that claim unless he brought his books up first* and allowed all usurious payments to be credited against the original principal that was borrowed. And often that wiped out the principal sum and he was allowed no claim at all.

"They took several appeals on that to Judge Grubb, but Judge Grubb sustained me; and I have had no more trouble since that time.

"MR. McLAUGHLIN: They did not go any further, then?

"MR. NESBIT. No, sir; they did not. I do not have any trouble with them now at all. Just as soon as you show that you are going to do justice and that you are firm with them, that the Court has no friends, and I will not allow anyone to have any advantage over another, your trouble is eliminated. At first the moneylenders all came to court to find out what I was doing; and when I would cut the claim of one of them, then the others would laugh. But I would cut the others just the same. And they all decided that it wasn't any use. So now they file their claims and give an *itemized statement* of what he (sic) original amount of the claim was, *showing the amount paid as usurious interest,* and that usurious interest is deducted from the principal, and I allow only for the difference, because they are taking their chance when they lend money on the basis of 240 per cent a year." (Emphasis supplied).[45]

### i. Deletion of Section 656(b) by National Bankruptcy Conference

Nevertheless, as successful as these procedures were in shielding borrowers from the ravages of "loan sharks," opposition soon developed from an unexpected quarter. Other than the automobile and personal finance companies, no one had indicated any disapproval of these legal innovations until the subject of wage earner proceedings was considered by the National Bankruptcy Conference for the first time at its meeting in Washington on April 17–19, 1936, held shortly after a five-day hearing on H. R. 10382.[46] In the brief time available, the Conference consolidated the provisions of H. R. 11219 into the general bankruptcy revision bill, as urged by Congressman Sumners, then chairman of the committee dealing with this legislation.[47] In the process of incorporating these provisions, however, the conference not only adapted many of them to the terminology and structure of the section dealing with arrangements for commercial concerns,[48] but also, deleted the

---

44. According to Referee Nesbit: "Our practice in Birmingham is to credit against the principal borrowed from the money lender all usurious interest paid as a payment on the principal and I do this under the Alabama laws relating to usury." Hearings on H.R. 8046, p. 68. See also Code of Ala. Tit. 9, sec. 65, where usury results in forfeiture of all interest, and usurious interest paid is deducted from principal.

45. Hearing on H.R. 11219, p. 5.

46. 12 J.N.A.R.B. 128 (July, 1938).

47. See Morgan, Ten Years of Legislative Work—With Suggestions for the Future, The Credit World, p. 23 (Oct. 1938).

48. See Weinstein, The Bankruptcy Law of 1938 (National Association of Credit Men, 1938) pp. 334–335.

requirement of having creditors prove that their claims were free of usury, as well as other key provisions considered essential by Referee Nesbit.[49]

No action was taken on H. R. 12889 since Congress adjourned before numerous amendments suggested by the House subcommittee could be considered. When the next session convened, the general bankruptcy revision bill was reintroduced on April 15, 1937, as H. R. 6439. Later in that session, the designation was changed to H. R. 8046, as it was known when finally enacted into law on June 22, 1938.

In the course of this legislative evolvement, Referee Nesbit, strongly supported by R. Preston Shealey, Washington counsel of the National Retail Credit Association, and Col. Sherrill, president of the American Retail Federation, strived to have the omitted provisions restored. As a first step, a separate bill, much along the lines of H. R. 11219 as originally drafted by Referee Nesbit, was introduced by Congressman Chandler on January 4, 1937, as H. R. 1981. Then in appearances before the House subcommittee at hearings in February and June, 1937, they urged restoration, stressing that the principles of wage earner relief could not be achieved without such provisions. As Referee Nesbit noted:

"MR. NESBIT: Then in about the middle of subsection (2), I have added:

'In proposed plans, the court shall require proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt is contracted.'

"That was left out of the bill and I think it should be in. Anybody who has had experience in this work will find, for instance, that in Birmingham there are over 50 short-term money lenders who file their claims in the court, and they charge anywhere from 240 to 500 per cent a year, and a debtor should be protected against them." [50]

In a strange development, however, even though Congressman Chandler believed that the provisions of H. R. 1981, which included a section identical in substance to the terms of Section 656(b), were more appropriate "to meet the practical side of this question," [51] the drafting committee of the Conference did not make any changes in the section on wage earner plans to include any of the deleted provisions. Accordingly, when its version of the revision of the bankruptcy law was passed on August 10, 1937, as H. R. 8046, unanimously without amendment, Section 656(b) was not among the provisions of Chapter XIII.

### j. Restoration and Enactment of Section 656(b)

In a dramatic turn of events, however, Section 656(b) was finally included in the monumental general bankruptcy revision legislation, when the House unanimously accepted a Senate amendment introduced and passed on June 10, 1938. This amendment was presented in the Senate by Sen. Joseph O'Mahoney, who had conducted the hearings on H. R. 8046 at which Referee Nesbit and the representatives of the retail credit associations appeared, in another effort to have the deletions restored. On the strength of their testimony,[52] Sen. O'Mahoney

49. No reason was ever expressed by members of the National Bankruptcy Conference in explanation of this deletion other than the comment that proof of "a negative is objectionable," as previously noted elsewhere in this opinion, and the vague remark by Referee Adams, "I do not think the bankruptcy law is the proper place for it." Hearings on H.R. 8046, p. 73. When questioned by Sen. O'Mahoney about what objections were urged for deleting Section 656(b), Referee Nesbit replied, "I do not know where that objec-

tion came from. I cannot conceive of anyone making it." Hearings on H.R. 8046, p. 71. In earlier testimony, he explained the action by noting, "I think there was a failure to realize the necessity for a provision of this kind in the bankruptcy law." Hearings on H.R. 8046, p. 65.

50. Hearings on H.R. 6439, p. 253.

51. Hearings on H.R. 6439, p. 56.

52. Hearings on H.R. 8046, pp. 61–72, 129–31. In this testimony, David R. Craig,

moved to amend Chapter XIII by restoring Section 656(b). In explaining his motion, Senator O'Mahoney made the following statement on the floor of the Senate:

"As Senators, who were present at the time of the earlier explanation will recall, this chapter of the bill refers to the plan which is now offered, by which wage earners may be given the opportunity to liquidate their indebtedness by regular installment payments through the superintendence of the court.

"Mr. President, one of the most impressive witnesses who came before the subcommittee was Judge Balentine (sic) J. Nesbit, special referee in bankruptcy, from Birmingham, Ala., who unfortunately has since passed away. Judge Nesbit had broad experience with the difficulties of wage earners under the terms of the old section 74, and did a remarkably fine piece of work. During his testimony before the committee he suggested this amendment, the effect of which is to provide that *if any person files a claim for money loaned he shall in his affidavit show that no usury is included in the claim.* Judge Nesbit, appearing before the committee, stated: 'H.R. 8046 does not include a provision that upon filing a proof of debt for money loaned, the affidavit shall be made that no usurious interest is included. I believe this should be included in the act, for certainly a debtor should not be required to pay usurious interest. In Birmingham, there are money lenders who charge 20 per cent per month and more alleged interest. It has been my practice to credit these payments on the principal amount of the loan and I accept no claim from a money lender that does not contain a statement that no usurious interest is included. It has worked quite satisfactorily.'

"I am sure there will be universal agreement that the suggestion is sound. *Money lenders who charge exorbitant interest rates in violation of law and of morals should not be given the assistance of the Federal courts in collecting their claims.*" (Emphasis supplied.)[53]

### k. *Underlying Policy of Chapter XIII*

This historic legislation was signed into law by President Roosevelt on June 22, 1938. In relation to wage earner proceedings, it culminated a crusade inspired by Judge Thacher in 1931 to devise an effective method by which financially distressed individuals could avoid harassment and oppression from "loan sharks" in paying their debts through periodical installments out of future earnings under the protection of the court. In hailing the enactment of this chapter, Congressman Chandler described it as "a measure designed to aid the debt-laden man or woman before he or she falls prey to the loan shark."[54] This objective could be effectively accomplished under Chapter XIII because, as he explained, a person may pay his debts "free from garnishment, execution, attachment, penalties or

President, American Retail Federation, presented an excellent summary of the need and meaning of Section 656(b) by stating: "The second difference relates to the determination of usurious claims. H.R. 1981 provides that the court shall require proof from each creditor that the claim is free from usury as defined by the laws of the place where the debt was contracted. H.R. 8046, the bill before you, contains no such provision.

"Usury, I am told, is a defense in any jurisdiction, but in accomplishing the purposes of this bill it would be manifestly more equitable to the wage earner, who is ordinarily ignorant of all legal forms and customs, *to require the court to investigate the matter of usurious interest rates, rather than to leave it to the debtor to raise the point as a defense against any claim.*" Ibid., p. 130. (Emphasis supplied).

53. 83 Congressional Record, Part 8, p. 8705, 75th Cong., 3rd Sess.

54. Small Debtor Settlement, The Credit World, p. 29 (January, 1940), an address delivered by the congressman over the Red Network of the National Broadcasting Company on December 9, 1939, 9:00–9:15 P.M. E.S.T.

excessive costs, under the protection of the Federal Court; and the Court will purge his debts of all usury."[55]

This review of the legislative history of Chapter XIII and, in particular, Section 656(b), thus makes eminently clear that the mandatory elimination of usury by the Court to the extent permitted under state law was a cardinal purpose to the total scheme of Chapter XIII. Any narrow or restrictive construction of that provision which would subvert that policy and produce an "absurd," "futile," or "unreasonable" result is contrary to the mandate of the Supreme Court. Perry v. Commerce Loan Co., 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966).

### V. *Analysis of Section 656(b)*

■ In construing Section 656(b), therefore, it is important to recognize that it was essentially devised to accomplish two principal objectives: 1) of imposing on the *court* the responsibility of assuring that claims are free from usury; and, 2) of eliminating the need of establishing the *existence* of usury by shifting the burden to the lender to prove the *absence* of usury. In furtherance of these objectives, since a claim cannot be allowed unless it complies with the provisions of the bankruptcy law, General Order 55(4) requires that such proof must be contained in each proof of claim filed by a lender.

As an indispensable element in the process of determining the allowance of claims, therefore, Section 656(b) necessarily must be invoked whenever the court performs that function. Under Section 57(d) claims must be allowed "upon receipt" unless their determination is continued. As contemplated by Sections 633(1) and (3), the determination of the allowance of claims as filed ordinarily occurs at the first meeting of creditors, in order that the acceptance or rejection of the proposed plan may be ascertained. It is then, of course, that the need for an instrument such as Section 656(b) becomes critical since the determination of the validity of any claim based on a small loan transaction *always* involves a question of usury.

■ In invoking Section 656(b), the court is simply fulfilling a *mandatory obligation* which must be honored irrespectively and independently of the debtor's right to contest the validity of the loan. It makes no difference whether the debtor disputes the claim or not. Cf., Parkfield Trust, Ltd. v. Dent, (1931) 2 K.B. 579; (1931) All E.R. 720. It is indeed immaterial even if the debtor insists that the claim is valid and should be paid under the plan. Cf., Mills Conduit Investment, Ltd. v. Leslie, (1932) 1 K.B. 233; (1932) All E.R. 442. Regardless of anything the debtor or others may or may not do about the allowance of the claim, therefore, nothing can relieve the court of its duty to demand proof from the lender that its claim is free from usury.

Thus, the lender, in proving the absence of usury, deals exclusively with the court in response to a demand for information. Its burden, accordingly, cannot be sustained by an allegation, legal conclusion or by a presentation of evidence merely sufficient to constitute a prima facie case, as if it were dealing only with the debtor or some other interested individual. Much more than that is required. To sustain its burden the lender must produce *all* of the facts directly or indirectly connected with the loan transaction to the extent of *reasonably* satisfying the court that no usury exists. In this respect, therefore, the process of determining the allowance of claims based on loans of money in wage earner proceedings is entirely different from the handling of an identical claim filed in a straight bankruptcy proceeding.

In considering the manner in which a claim is ordinarily proved, it should be understood that a proof of claim is nothing but a *deposition*[56] in which all of the

---

55. Ibid., p. 29

56. 3 Collier on Bankruptcy par. 57.03 p. 128; In re United Wireless Telegraph Co., D.C.Me., 201 F. 445, 29 Am.Bankr. Rep. 848.

essential elements of a claim are briefly stated. In addition to documentary evidence, it may include transcribed testimony or affidavits of facts. Moreover, if the written proof is deficient, there is no reason why it cannot be supplemented by oral evidence at the hearing conducted on the claim. Ample opportunity exists, therefore, for a lender to prove its case in a relatively simple and inexpensive manner.

■ According to the provisions of Section 656(b), reference must be made to the state law governing the particular kind of transaction in order to ascertain whether the loan is usurious. Usury is generally defined as a prohibition against the exaction or imposition of *any* charge for the loan of money in excess of that permitted by law.[57] Such a prohibition is contained in the Maine Small Loan law governing loans of $2,500.00 or less.[58] 9 M.R.S.A. Sections 3001–3162. Section 3081 specifically regulates the maximum interest which can be charged by a licensed lender [59] and Section 3082 prohibits other charges in excess of that maximum unless otherwise specifically permitted. In this respect, Section 3082 establishes a single, all-inclusive maximum charge, whether for interest or otherwise, which can be exacted from or imposed on borrowers. As amended in 1963 it reads in part:

"In addition to the interest provided for, no further or other charge or amount whatsoever for any examination, service, brokerage, commission or other thing, or otherwise, shall be directly or indirectly charged, contracted for or received, except insurance premiums and any gain or return to the licensee therefrom, and lawful fees, if any, actually and necessarily paid out by the licensee to any public officer for filing or recording in any public office any instrument securing the loan, which fees may be collected when the loan is made, or at any time thereafter."

■ It is important to recognize, however, that usury is not restricted in meaning to excessive *interest* as that term may be defined or characterized *by the lender,* but rather embraces any charges for collateral transactions associated with the loan, such as for credit insurance, if the lender derives an illegal monetary gain, as additional compensation for the loan.[60]

---

57. Originally, usury was a prohibition against any charge for the use of money. In due course, a distinction was drawn between usury and interest. As noted in Homer, A History of Interest Rates, (Rutgers, 1963), p. 73: " * * * The Latin noun *usura* means the 'use' of anything, in this case the use of borrowed capital; hence, usury was the price paid for the use of money. The Latin verb *intereo* means 'to be lost'; a substantive form *interisse* developed into the modern term 'interest.' Interest was not profit but loss." In due time, therefore, interest was permitted as payment for the *loss* rather than for the *use* of the money. Once this distinction became established, usury was then restricted to the exaction of any charge for the use of money or forbearance of demanding payment of a debt in excess of the interest prescribed by law. See also Ryan, Usury and Usury Laws (1929); Meth, A Contemporary Crises of Usury in the United States, 44 ABAJ 637 (1958); and Bernstein, Background of a Gray Area in Law: The Checkered Career of Usury, 51 ABAJ 846 (1965).

58. Charges in excess of those permitted under the small loan law are consistently considered as usury in the text and authorities cited in a pamphlet prepared by specialists in the small loan industry and published in 1943 by the Conference on Personal Finance Law entitled, Detection of Usurious Claims and Illegal Charges in Wage Earner Bankruptcies, A Handbook for the Use of Referees in Bankruptcy and Trustees of Wage Earners' Estates Under Chapter XIII; see also Hubacheck, Annotations on Small Loan Laws, (Russell Sage Foundation, 1938) pp. 82–83, 146–147, 156–158, and appendix F. Classified Bibliography, pp. 224–230, for an identical treatment of the term insofar as small loan transactions are concerned.

59. Section 3086 regulates the amount of interest which can be charged by an unlicensed lender. 9 M.R.S.A. § 3086.

60. It should be noted that the word "charge" as used in small loan laws means "interest." As expressed by Rolf Nugent, Director, Department of Con-

Lastly, in determining the effect of Section 656(b), the court must first refer to the state law governing such transactions. Under Maine law, a small loan is either entirely valid or, if excessive or unauthorized charges are detected, is completely void and unenforceable. 9 M.R.S.A. § 3082.[61] Therefore, if the proof of claim filed by a lender shows excessive charges, then the claim must be disallowed as being void under Maine law. On the other hand, however, if the lender fails to prove that the claim is free from usury, then the claim likewise must be entirely disallowed in that it was not duly proved within the meaning of Sections 57, 656(b), and G.O. 55(4).[62] Accordingly, in Maine it makes no difference whether usury is detected or the lender fails to sustain his burden, because, in either event, the entire claim must be disallowed.

No decision or secondary authority exists either in support or rejection of this analysis of Section 656(b). The only meaningful discussion of Section

sumer Credit Studies, in Foreward, pp. vii-viii of Hubacheck, Annotations on Small Loan Laws: "It seems necessary, however, to call attention to one of these changes in order that certain passages of this volume may be read in their correct light. Section 13 of the Sixth Draft grants to licensed lenders the special right to charge 'interest' at a rate materially exceeding the general maximum contract rate. But in sweeping language this section also denies licensees the right to make any additional charges whatsoever, even though such charges might be allowed under the principles of law as *bona fide* expenses, clearly distinguishable from interest within the usual and customary meaning of that word. Thus the word 'interest' has come to have two meanings. In relation to licensed lenders, it has included all sums which the borrower may be required to pay; while in relation to other lenders, it may and frequently does include only a part of the charges borne by the borrower. The use of the word in the Uniform Law has, therefore, tended to exaggerate the true extent of the special right granted to licensees, in comparison with the rights and practices of other lending agencies. In order to avoid this dual definition of interest and the misconceptions to which it gives rise, the word 'charges' will be substituted for the word 'interest' in Section 13 and in other sections which refer to the maximum rate permitted licensees." Moreover, it should be recognized that the words "interest" or "charge" are not to be narrowly construed. As expressed by Hubacheck, Ibid, pp. 146–147: "Questions of usury turn ultimately on the meaning of interest. Interest is compensation for the use of money lent. Whatever thing or benefit comes to the lender as compensation for the use of money is interest, no matter what name it may be given or what expedients may be adopted to conceal the fact that the benefit received is, in essence, compensa-

tion for the use of the money. No matter how remote a collateral transaction may seem to be, no matter how shrewdly it is made to appear that a payment to the lender is for something else, if the facts, taken together and read in the light of human experience, justify a natural inference that the lender received the benefit because the borrower had the use of his money and as compensation for the use, the benefit is interest. As such it must be added to all similar benefits to determine whether the aggregate exceeds the rate of compensation which the lender is permitted to receive."

61. In this respect Section 3082 reads: "If interest or charges in excess of those permitted by this section and section 3081 shall be charged, contracted for or received, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges whatsoever."

62. In many states, small loan laws provide for the disallowance of only the usurious portion of the claim. Nevertheless, the *entire* claim must be disallowed even in such states if the lender fails to sustain his burden, *unless* the usurious portion of the loan can be isolated as a separate and identifiable item, e.g., such as an insurance premium. In response to a question from Sen. O'Mahoney as to the effect of Section 656(b), Referee Nesbit replied: " * * * He is required to make a positive statement under oath, excluding all usurious interest. If he is not willing to do that, his claim is not approved." Hearings on H.R. 8046 p. 69. See, however, Referee Clive Bare Excises Usury from Small Loan Company Claim in Chapter XIII Proceedings, 40 J.N.C.R.B. 101 (Oct., 1966) for an outstanding example of how a separate, identifiable item of usury was treated in a case where lender failed to sustain burden of proving the absence of usury.

656(b) since its enactment in 1938 is found in a pamphlet prepared in 1943 by specialists in the small loan industry, as a special committee of the Conference on Personal Finance Laws, entitled Detection of Usurious Claims and Illegal Charges in Wage Earner Bankruptcies.[63] It is interesting to note that their viewpoint fully supports the meaning ascribed to Section 656(b) by this Court.[64]

On page 9 of this pamphlet it is stated:

> "The insolvent wage earner who has become the victim of the illegal lender long has needed a legal remedy short of bankruptcy whereby he could extricate himself from his predicament. By the enactment of Chapter XIII of the Bankruptcy Act, Congress has provided such a remedy. Section 656(b) of that Chapter requires every creditor to prove affirmatively that his claim is free from usury.

> "Under Section 656(b) a vigorous Referee can deny an illegal lender his unlawful profit and, where the law so provides, his claim for principal as well. The Referee can thus become an effective force against this social evil. The wage earner and his family, as the beneficiaries of an efficient administration of this law, can gain greater confidence in democratic processes of government."

## VI. Usury Concealed Through Credit Insurance Transactions.

The need for an instrument such as Section 656(b) is now even more imperative than it was in 1933 or 1938, not only because of the phenomenal growth of consumer credit and the concomitant increase in wage earner proceedings, but also, because the impression that small loan transactions are strictly regulated by state agencies is largely a myth, especially in any areas of sophisticated violations.[65] Indeed, today, the entire structure of the small loan law is threatened by the infinite variety of devious schemes which exist for evading the fundamental concept of rigid rate regulation through the recent development of lenders issuing credit life, accident and health and personal property insurance in connection with nearly every loan transaction.[66]

Of the numerous problems of usury arising from the use of credit insurance, ostensibly employed as additional security for loans, the most disturbing relates to the unconscionably high profits lenders realize as a result of "reverse"

63. In the foreward of this pamphlet it is noted: "This handbook describes many of the devices used to disguise usurious transactions. It has been prepared by a special committee of the Conference on Personal Finance Law, consisting of Paul F. Boyer, Chicago, Edmund Burke, Boston, James H. Cronin, Chicago, Holland C. Pike, Chicago, Linn K. Twinem, New York, and Charles S. Kelly, Chicago, Chairman." In one way or another, all of these individuals occupy or have in the past occupied, important positions in major national small loan companies.

64. See also Twinem, Bankruptcy Guide for Small Loan Companies, (Beneficial Finance Co., 1959) pp. 232–234, and 268, as to a brief discussion of the requirements of Section 656(b) and an example of a form of affidavit showing that the claim is free from usury, used before lenders began charging borrowers for credit insurance, as "a method of making such proof in the case of a small loan obligation." Ibid., p. 3 (Emphasis supplied).

65. See, Mors, Small-Loan Laws and Credit Insurance, Ins. Law J. pp. 778, 798 (Dec., 1954); also, Credit Insurance in Consumer Finance, statement by James H. Hunt, Vt. Comm. of Banking and Insurance, in an address before the National Association of Consumer Credit Administrators (May 7, 1966) in which he remarks: "Unfortunately, it must be reported that there is, with some exceptions, little effective regulation of this field on the part of the insurance commissioners of the various states."

66. For a description of this kind of insurance, a history of development of a model bill, references to various studies, reports, articles and decisions, analysis and determination of violations under this model bill, see In re Richards CCH Installment Credit Guide (No. 98, 556) decided by this Court on December 11, 1965.

competition, aided by the further device of the "captive" insurance company, which permits them to sell credit insurance to a "captive" market at the *highest* possible cost. As a consequence, those who can least afford it are not only required to pay rates more than double the amount charged by many other financial institutions for identical coverage and terms, but also, must pay interest as high as 36 per cent annually on such inflated premiums.[67]

The term "reverse" competition is used because the market for the sale of credit insurance to small loan lenders improves as the cost of the insurance increases, rather than the opposite as normally would be expected. It occurs because the debtor, as part of a "captive" market, can be compelled by the lender to pay the highest possible rate and entire cost for credit insurance and therefore is not a factor in competition. It is the profit and not the cost which governs the negotiation for the purchase of the group policy by the lender. Therefore, any competition that may exist is among insurance companies in negotiating with the lender to make their product attractive by offering the lender the greatest possible profit. But, frequently, even this competition does not exist since the lender may operate through a "captive" insurance company, which is either owned or controlled by the lender.

The insidious aspect of "reverse" competition is that it is accomplished under the guise that the lender pays as much for the insurance as he charges or transfers to the borrower, in that the "premium" in each instance is *identical* in relation to what appears on the face of the group policy and certificates issued thereunder.[68] In most instances the amount of the "premium" conforms to the schedule of rates on file with the Insurance Department. In reality, however, the "premium" is *different*, with the borrower paying more (the overcharge) than what the lender pays to the insurer, as pre-arranged in negotiations conducted under the destructive principles of "reverse" competition. In order to avoid detection, this difference in premiums is often camouflaged in financial reports as "commissions," "premium refunds," "restrospective credits," or "dividends," which, as an essential element of this process, are retained or paid to the lender under a prearranged agreement. A study of the voluminous reports contained in the "Proceedings of the National Association of Insurance Commissioners" and other works suggests that this additional profit far exceeds any costs of administration incurred by the lender and has no legal or economic justification, in terms of the customary insurance transaction.[69]

---

67. In a recent article entitled "Dirty Deal in Small Loans," appearing in the Oct. 8, 1966, edition of The New Republic, it was noted that an unpublished report on credit life insurance of the U.S. Senate Antitrust and Monopoly Subcommittee "indicates that borrowers have been overcharged $700 million since 1959." Reference is also made to enormous profits made possible through "reverse" competition and "captive" insurance companies. See also, Hunt, Credit Insurance in Consumer Finance, op. cit., supra, note 65.

68. As the State of New York Insurance Department and others have pointed out: "The inferior bargaining position of the debtor virtually creates a 'captive market' in which the creditor can dictate the choice of insurance coverages, premium rates, insurer and agent. This captive market and superior position of the cred-

itor has perverted normal competition among insurers selling credit life and accident and health insurance. Premium rates in many instances are being set at levels determined by the rate of return to the creditor in the form of dividends, experience-rating refunds or other allowances, instead of on the basis of the lowest possible reasonable cost to the insured debtor." Vol. 1, 1961 Proceedings, National Association of Insurance Commissioners, p. 296. See also, Vol. I, 1956 Ibid. p. 155; Vol. II, 1956 Ibid. p. 374; Vol. I, 1958, Ibid. pp. 121, 150; Vol. I, 1963 Ibid. pp. 178–182; Mors, Small-Loan Laws and Credit Insurance, Ins. Law Journal p. 790 (Dec., 1954); and, Kedzie, Consumer Credit Insurance (1957) pp. 39, 40, 163–64.

69. Vol. I, 1958 Proceedings, National Association of Insurance Commissioners,

Lenders, ironically, rely upon a broad construction of legislation enacted in 1961 by the Maine legislature to regulate the credit insurance business in an endeavor to eliminate the extensive abuses and unscrupulous practices committed particularly by small loan lenders, to support the manner in which they handle credit insurance transactions.[70] 24 M.R.S.A. Sections 1201–1214. Under that legislation, lenders may compel credit insurance coverage as additional security for the loan, the "premium or cost" of which can be charged or transferred to the borrower as part of the principal. 24 M.R.S.A. Sections 1209, 1211. However, in order to foreclose any objection that such a "charge" or monetary benefit therefrom would automatically invalidate the loan under the small loan law, it was provided by Section 1209 that:

> "The premium or cost of such insurance when issued through any creditor shall not be deemed interest, or charges, or consideration, or an amount in excess of permitted charges in connection with the loan or other credit transaction, and any benefit or return or other gain or advantage to the creditor arising out of the sale or provision of such insurance shall not be deemed a violation of any other law, general or special, of the State of Maine."

In addition, Section 3082 of the small loan law was amended in 1963 to exclude "insurance premiums and any gain or return to the licensee therefrom" from the prohibition against "no other charges."

In view of the history, purpose, and provisions of the credit insurance and small loan laws, it is apparent that the insulation provided by Section 1209 is not without some limitation. As this court decided in a decision rendered on December 11, 1965, Section 1209 does not provide complete immunity against the rigors of the small loan law, since only "lawful" premiums or costs for credit insurance can be exacted from or imposed on borrowers. In re Richards, CCH Installment Credit Guide, (No. 98, 556). Likewise, as this decision infers, the exemption of Section 1209 is also inapplicable if the "benefit or return or other gain or advantage" is not obtained in a *lawful* manner.[71] More directly, Section 1209 is restricted by Section 1208(4), a provision designed as a safeguard against overcharging by lenders, in that it provides that the amount charged to a debtor "shall not exceed the premiums charged by the insurer." In the context of "reverse" competition, "premiums" in this instance means the premium determined through negotiations between the insurance company and lender and not necessarily what appears on the face of the documents.[72] Another limitation is indicated by the underlying purpose of the credit insurance law, namely, of permitting the requirement of

---

pps. 113–145. According to an analysis by the State of New York Insurance Department "The 'N.A.I.C. Study on Credit Life and Credit Accident and Health Insurance.' * * * is replete with instances of unconscionably low loss ratios and excessive commissions and fees." Vol. I, 1961 Proceedings, National Association of Insurance Commissioners p. 296; see also, Vol. II, 1964 Proceedings, National Association of Insurance Commissioners pps. 471–512, for report of another study by N.A.I.C. for period covering 1960–1962 for further evidence of overcharging.

70. See In re Richards CCH Installment Credit Guide (No. 98, 556) for a review of the history of the development of the model credit insurance act as a means of protecting needy and unfortunate borrowers against the reprehensible conduct of the small loan concerns, as disclosed by several investigations and studies in the 1950's.

71. E.g., such as receiving commissions where lender is not licensed as an agent, or in violation of other provisions of legislation covering insurance transactions.

72. This interpretation is buttressed by the language of Section 1209 which permits only the "premium or *cost*" of credit insurance to be charged or transferred to a borrower. The use of the word "cost" obviously relates to the amount the lender must pay as a premium to the insurer under the group policy.

such insurance as *additional security* for the loan. Section 1211. If, however, it is found that lenders are *compelling* borrowers to purchase such insurance primarily for *additional profits*, then the basis of the authorization under the credit insurance law no longer exists. Therefore, the exculpatory provisions of Secs. 1209 and 3082 are inapplicable. In any event, finally, regardless of the peculiar language employed, the provisions governing credit insurance transactions should not be interpreted so as to sanction devious schemes through which lenders obtain exorbitant profits by exacting or imposing excessive charges in derogation of the fundamental concepts of both the credit insurance and small loan laws.

### VII. *Conclusion*

No extended analysis of the credit insurance and small loan laws is necessary to demonstrate that an exceedingly serious question of usury exists whenever it is found that a borrower has been charged for some kind of credit insurance by a small loan lender. It is impossible, however, to determine that question unless every aspect of the lender's *involvement* in the insurance transaction is definitively disclosed to the extent of reasonably satisfying this court that the charge imposed or any additional profit derived therefrom was not in direct or indirect violation of these laws.

It is obvious that the proof of claim filed by Beneficial is devoid of the information needed to satisfy this court that the claim is free from usury, not only as to the charges for credit insurance but also as to several other possible violations of the small loan law. In the absence of such information, therefore, Beneficial has not duly proved its claim within the meaning of Sections 57, 656(b) and G.O. 55(4).

In light of the principles and other considerations noted in this opinion, it is therefore, ordered, adjudged and decreed that the unsecured claim filed in this proceeding by Beneficial Finance Co. (Maine) in the amount of $402.77, be and hereby is entirely disallowed.