**In the Matter of Robert R. RICHARDS and Gail L. Richards, Debtors.**

**Nos. Bk-63-1324, Bk-63-1325.**

United States District Court
D. Maine, S. D.

July 20, 1967.

Sidney W. Wernick, John J. Flaherty, Theodore H. Kurtz, Portland, Me., Edward L. Caron, Biddeford, Me., for Aetna Finance Co., petitioner for review.

Gerald S. Cope, Portland, Me., trustee.

James R. Flaker, Portland, Me., for trustee.

Charles W. Smith, Saco, Me., George P. Limberis, Bangor, Me., for debtor.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

Aetna Finance Company of Maine petitions for review of an order of the referee

in bankruptcy entered in these consolidated proceedings for a wage earner plan under the provisions of Chapter XIII of the Bankruptcy Act, 11 U.S.C. §§ 1001–1086 (1964). By his order the referee disallowed a secured claim filed by Aetna because the loan contained "excessive, unauthorized and illegal" charges for credit life and disability insurance, thereby rendering the loan usurious and void under the provisions of the Maine Small Loan Law, 9 M.R.S.A. §§ 3001–3162 (1964).

The material facts may be briefly stated. On December 7, 1963, the debtors, Robert R. Richards and Gail L. Richards of Lewiston, Maine, filed petitions for wage earner plans under Chapter XIII of the Bankruptcy Act, listing debts of $2,118.81 and assets of $619, and proposing to remit $15 each week for the purpose of paying their debts in full over a period of three years. In the schedules attached to their petitions, the debtors listed a debt to Aetna in the amount of $957.22, secured by a chattel mortgage on household goods, with the notation that the debt was disputed as being in violation of the Maine Small Loan Law.

Following consolidation of the proceedings, a first meeting of creditors was held on December 26, 1963. At this meeting, Aetna appeared by counsel and filed a proof of claim in the amount of $957.22, to which was attached a copy of the note upon which it was based, the chattel mortgage securing the same, the ledger cards relating to the transaction, and an affidavit of Aetna's local manager that to the best of his knowledge and belief "no usury has been charged said debtors on said account." The referee continued for a later determination the question of the validity of Aetna's claim, and at the conclusion of the meeting entered an order declaring the plan accepted, appointing a trustee and confirming the plan.[1]

On December 22, 1964, approximately a year after confirmation of the plan, the trustee for the first time filed formal objections to Aetna's claim. The debtors joined in these objections on January 11, 1965, and after extensive pre-trial proceedings, the hearing on Aetna's disputed claim was finally held before the referee on June 29 and July 9, 1965.

The evidence presented at the hearing disclosed that the debtors had borrowed from Aetna on two different occasions, once on March 7, 1961 and again on July 2, 1962. On the second occasion, the debtors signed a note in the face amount of $1,174.73,[2] which provided for payment of the maximum interest then permitted under Maine law.[3] The note was secured by a duly recorded chattel mortgage covering the debtors' household goods. The principal amount of the note included a credit life insurance premium of $35.24 and a credit health and accident insurance premium of $115.92. As a part of the loan transaction, the debtors received a certificate of insurance for credit life and disability benefits under a creditors group life and disability policy issued to Aetna by Old Republic Life Insurance Company, an insurer duly au-

---

1. An earlier petition filed by Aetna for review of the order of confirmation was withdrawn, by agreement with the trustee, in order to permit determination by this Court of the important question of Maine law raised by the present petition. To the extent that the plan dealt with Aetna's claim, the referee was without authority to declare the plan accepted or confirmed over Aetna's objection, at least until Aetna's secured status had been determined. See opinion filed this date In re Cheetham, 272 F.Supp. 501 (D.Me.1967).

2. As shown by Aetna's voucher of the transaction, the note was made up of the following items:

| Payment of unpaid principal of prior loan | $ 856.99 |
|---|---|
| Recording fee | 1.00 |
| Insurance premiums | 151.16 |
| Cash to borrowers | 165.58 |
| Total amount of loan | $1174.73 |

3. The note called for payments of $46 a month for 36 months, a total payment of $1656 over the three-year period.

thorized to do an insurance business in the State of Maine.[4] The referee found, and his finding is amply supported by the evidence, that the amounts charged the debtors for credit insurance were in excess of any amounts authorized to be charged for such insurance under the then applicable provisions of the Maine Credit Insurance Law, 24 M.R.S.A. §§ 1201–1214 (1964).[5] However, significantly, no evidence was presented at the hearing, either by Aetna or by the trustee, to show whether the amount charged by Aetna to the debtors for credit insurance was the same as, or greater than, the premium charged by Old Republic to Aetna, and the referee made no finding in this respect.[6]

On December 11, 1965, the referee filed an exhaustive opinion and an order declaring Aetna's loan void under the Maine Small Loan Law, and entirely disallowing its claim under the Bankruptcy Act.[7]

A careful reading of his opinion indicates two alternative bases for his decision. The principal basis was that in addition to the maximum interest allowed by the Small Loan Law, the debtors had been charged for credit insurance an amount in excess of the premium authorized by the Credit Insurance Law. Alternatively, the referee ruled that, in any event, Aetna had failed to prove that it had not improperly profited from the transaction by charging to the debtors for the insurance more than the premium charged to it by Old Republic, and therefore Aetna had failed to establish that its claim was free from usury as required by Section 656(b) of the Bankruptcy Act, 11 U.S.C. § 1056(b) (1964).

For the reasons hereinafter stated, the Court is persuaded that both the principal and the alternative bases of the referee's ruling are erroneous, and that the order disallowing Aetna's claim must be reversed.

4. The certificate of insurance recites that Robert R. Richards is insured in the amount of $1174.73 with a monthly indemnity of $46 for the term of 36 months and specifies a premium of $35.24 for the life coverage and a premium of $115.92 for the disability coverage. The referee's finding that this certificate was prepared by Aetna is not supported by the evidence, which does not disclose whether it was prepared by Aetna or by Old Republic.

5. The evidence established that as of July 2, 1962, the date of the loan transaction, the Maine Insurance Commissioner had not approved either the type of insurance coverage provided or the rates in fact charged for the coverage, as required by the Credit Insurance Law and the regulation promulgated thereunder. Bulletin No. 92 (amended) (January 16, 1962) of the Insurance Department of the State of Maine was then in effect and was quite evidently not complied with. For present purposes the Court accepts the referee's assumption that as of July 2, 1962 the Maine Credit Insurance law required that the premium rate charged these debtors be approved by the Insurance Commissioner. However, it should be noted that Section 1207(6) of the Credit Insurance Law appears to except from such requirement the premium rate on a group policy in effect on September 16, 1961 until the next anni-

versary date of the policy, and the evidence in this case does not disclose the anniversary date of the group policy issued by Old Republic to Aetna which was in effect on July 2, 1962.

6. The certificate of insurance issued to the debtors contains the printed signature of Old Republic's president and reads as though it had been issued by Old Republic. However, the record is devoid of any evidence that Old Republic in fact prepared the certificate, supra n. 4. Nevertheless, Aetna argues that a finding that the charges were identical is compelled by the fact that the certificate of insurance recites the same premium charge as that specified in the note. On the other hand, the trustee argues that Old Republic's proposed coverage and rates, as filed in December of 1963, indicate something about the coverage and rates that they were charging 17 months earlier. Plainly, neither inference is compelled or even justified. Production in evidence of the master policy was the minimum required to establish the premium charged by Old Republic to Aetna for this coverage.

7. In re Richards, 4 CCH Installment Credit Guide para. 98,556 (D.Me. Dec. 11, 1965). For an interesting aspect of this litigation see In re Richards, 223 A.2d 827 (Me. 1966).

## I

An analysis of the relevant provisions of the Maine Small Loan Law and the Maine Credit Insurance Law shows conclusively that Aetna's loan transaction with these debtors was not rendered void simply because the charge to the debtors for credit insurance exceeded the authorized premium rate.

The Maine Small Loan Law was enacted in 1917 in an effort to attract established lending agencies into the small loan financing field and to protect borrowers against "loan sharks." P.L. (Me.) 1917, c. 298, §§ 1–19.[8] This legislation provided for the licensing and regulation of small loan lenders and prescribed the maximum amount of interest which they could charge. The section of the law which is of present concern is Section 3082, which as of July 2, 1962, the date of Aetna's loan transaction with these debtors, read in material part as follows:

> In addition to the interest herein provided for, no further or other charge or amount whatsoever for any examination, service, brokerage, commission or other thing, or otherwise, shall be directly or indirectly charged, contracted for or received, except lawful fees, if any, actually and necessarily paid out by the licensee to any public officer for filing or recording in any public office any instrument securing the loan, which fees may be collected when the loan is made, or at any time thereafter. If interest or charges in excess of those permitted by sections 217 and 218 shall be charged, contract-

> ed for or received, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges whatsoever.

R.S. (Me.), c. 59, § 218 (1954).

The Maine Credit Insurance Law became the law of Maine in 1961. P.L. (Me.), 1961, c. 221, §§ 170A–170N. With certain changes, it was based upon the Model Credit Insurance Act proposed by the National Association of Insurance Commissioners to regulate the rapidly expanding credit insurance industry.[9] As enacted in Maine, this law authorizes the issuance of credit life and disability insurance in the form of either an individual policy (issued directly to the debtor) or a group policy (issued to the creditor insuring his debtors) (Section 1203).[10] The amount and the term of any such insurance are limited (Sections 1204, 1205), and full disclosure to the debtor of the coverage and the premium charged is required (Section 1206). A key provision requires that all proposed policy forms and rates be filed with the Insurance Commissioner, who is charged with the responsibility of approving or disapproving them in accordance with specified statutory standards (Section 1207). The law further prohibits any insurer from issuing any policy "for which the premium rate exceeds that determined by the schedules of such insurer as then on file with the commissioner" (Section 1208(1)), and provides that the amount charged by a lender to a debtor for any such insurance "shall not

---

8. The Maine statute was based upon the first draft of the Uniform Small Loan Act sponsored by the Russell Sage Foundation. For a description of the history and development of small loan legislation, see generally Curran, Trends in Consumer Credit Legislation (1965); "Combating the Loan Shark," 8 Law and Contemporary Problems (1941); Hubachek, Annotations on Small Loan Laws (1938).

9. For a description of credit life and accident and health insurance, its history and development, together with an analysis of the various abuses which lead to the enactment of credit insurance legislation, see generally: Kedzie, Consumer Credit

Insurance (1957); Report of the Subcommittee on Antitrust and Monopoly Legislation of the Committee on the Judiciary of the United States Senate, "The Tie-in Sale of Credit Insurance in Connection with Small Loans and Other Transactions," 83d Cong., 2d Sess. (1955) (Also known as the Langer Report). For other source material see footnotes 1, 13–15, 18–22, 24–44, and 47 of the referee's comprehensive opinion, In re Richards, supra.

10. The law also reserves to the debtor the option of furnishing any required insurance through a policy of his own (Section 1211).

exceed the premiums charged by the insurer, as computed at the time the charge to the debtor is determined." (Section 1208(4)). Finally, the law authorizes the Insurance Commissioner to issue appropriate regulations and orders, the latter being subject to court review (Sections 1212, 1213), and provides penalties in the form of fines and license revocation or suspension for violation of the Commissioner's orders (Section 1214). In Section 1209, which is crucial to the present case, the law provides:

> All policies of credit life insurance and credit accident and health insurance shall be delivered or issued for delivery in this State only by an insurer authorized to do an insurance business therein, and shall be issued only through holders of licenses or authorizations issued by the commissioner. *The premium or cost of such insurance when issued through any creditor shall not be deemed interest, or charges, or consideration, or an amount in excess of permitted charges in connection with the loan or other credit transaction, and any benefit or return or other gain or advantage to the creditor arising out of the sale or provision of such insurance shall not be deemed a violation of any other law, general or special, of the State of Maine.* The insurance premium or

other identifiable charge for such insurance may be collected from the insured or included in the finance charge or principal of any loan or other credit transaction at the time such transaction is completed. (Emphasis supplied.)[11]

It is evident from the foregoing that in enacting the Credit Insurance Law, the Maine Legislature considered that it had promulgated a comprehensive system for the regulation of the issuance of insurance in connection with loans and other credit transactions. And it would be difficult to conceive of plainer statutory language than the language of Section 1209 which provides that the premium (in the case of an individual policy) or the cost (in the case of a group policy) of such insurance "shall not be deemed interest, or charges, or consideration, or an amount in excess of permitted charges" in connection with the loan or credit transaction. Nothing could be more clear than that this language removes by definition charges for credit insurance from the scope of the "further or other charge or amount" prohibited by Section 3082 of the Small Loan Law, at least so long as the creditor complies with the Credit Insurance Law by charging the debtor no more than the premium charged it by the insurer.[12]

---

11. Significantly, the second sentence of Section 1209 as quoted above was not a part of the NAIC model act. In this respect, the model act suggested that if a state prohibited payments for insurance by the debtor in connection with a credit transaction, the following provision might be included: "Nothing in this Act shall be construed to authorize any payments for insurance now prohibited under any statute, or rule thereunder, governing credit transactions." See Vol. 1, 1961 Proceedings, National Association of Insurance Commissioners, p. 304.

12. Prior to the enactment of credit insurance legislation, there was a serious question as to whether a charge for credit insurance by a creditor in a small loan transaction rendered the entire transaction void under the Small Loan Law. In the absence of a credit insurance law expressly authorizing such charges, some

courts automatically invalidated the loan if any insurance charge was exacted. Home Finance Co. v. Padgett, 54 So.2d 813 (La.App.1951) (life insurance); Strickler v. State Auto Fin. Co., 220 Ark. 565, 249 S.W.2d 307 (1952) (life, accident and health insurance). The great majority of courts, however, viewing the insurance transaction as a separate and distinct business arrangement, allowed such charges as part of the loan transaction, at least if the lender did not profit thereby. Mills v. Parrott, 237 S.W.2d 851 (Ky.1951) (life insurance); Maellaro v. Madison Fin. Co., 131 N.J.L. 160, 35 A.2d 714 (1944) affirming 130 N.J.L. 140, 31 A.2d 485 (1943) (insurance on asset pledged); Martorano v. Capital Finance Corp., 289 N.Y. 21, 43 N.E.2d 705, 143 A.L.R. 1318 (1942) (insurance on asset pledged); Auto Owners' Finance Co. v. Coleman, 89 N.H.

Despite Section 1209's definitive exclusion of insurance charges from the pale of the Small Loan Law, the referee asserted that:

in construing Section 1209, this Court must endeavor to achieve a consistent and harmonious system of law. City of Belfast v. Bath, 137 Me. 91, 15 A.2d 249 (1940); State v. London, 156 Me. 123, 162 A.2d 150 (1960); 1 Sutherland Statutory Construction sec. 2012. Therefore, while insurance charges were not specifically mentioned in Section 3082 until 1963, (see note [13] below), it is apparent that Section 1209 had the immediate effect of expanding the small loan law but *only* to the extent that any question as to the legality of making charges for *authorized* insurance was eliminated. (Emphasis in original.)

He then continued:

by expressly restricting the application of the exemption under Section 1209 to the "premiums (sic) or cost of *such* insurance", the Maine Legislature unequivocally referred to *lawful* premiums for insurance authorized under the credit insurance law in modifying the "other charge" provision of section 3082. (Emphasis in original.)

■ Thus, the referee construed the words "premium or cost of such insurance" as they appear in the second sentence of Section 1209 as meaning "*lawful* premiums for insurance authorized under the credit insurance law." However, it is clear that the words "such insurance" in the second sentence refer directly and only to the words "credit life insurance and credit accident and health insurance," which appear at the beginning of the first sentence. There is no ambiguity in the language used by the Legislature in Section 1209, and it has long been the established law of Maine, as elsewhere, that "statutory language which is clear and unambiguous must be held to mean what it declares plainly." State v. White, 145 Me. 381, 382, 71 A.2d 271, 272 (1950); Estabrook v. Steward Read Co., 129 Me. 178, 182, 151 A. 141 (1930); Opinion of the Justices, 125 Me. 529, 535, 133 A. 265 (1926); 2 Sutherland, Statutory Construction § 4502 (3rd ed. 1943). Furthermore, as the Maine court said in Burrill Nat'l Bank v. Edminister, 119 Me. 367, 370-371, 111 A. 423, 425 (1920), "Resort may be and should be had to the genesis and evolution of statutes to explain, but not to discover ambiguities."

■ This Court also rejects the suggestion that the construction adopted by the referee is required in order to achieve a "consistent and harmonious system of law." It is evident from an examination of the over-all pattern of the Credit In-

---

356, 199 A. 365 (1938) (auto insurance); Platz v. Lapinski, 263 Mich. 240, 248 N.W. 607 (1933) (insurance on asset pledged); Friedman v. Wisconsin Acceptance Corp., 192 Wis. 58, 210 N.W. 831, 53 A.L.R. 758 (1926) (insurance on asset pledged); Niles v. Kavanagh, 179 Cal. 98, 175 P. 462, 1 A.L.R. 831 (1918) (insurance on asset pledged). These courts invalidated the loan if the charge made by the lender for insurance was in reality a scheme by the lender for acquiring more compensation for the use of its money than the statute permitted. See, e. g., Martorano v. Capital Finance Corp., supra at 24, 43 N.E.2d at 706: "The lender may, of course, not impose such condition as a cover for obtaining greater compensation than the law permits, and here there is no claim that the lender could or did obtain additional compensation in any form." At least one court

permitted the lender to receive a reasonable sales commission from the insurance company in addition to maximum interest from the debtor where the debtor was not required to obtain the insurance through the creditor. State v. Bankers Finance Corp., 41 Del. 566, 26 A.2d 220 (1942) (insurance on asset pledged).

13. In 1963 Section 3082 was amended so that in part it read:

In addition to the interest provided for, no further or other charge or amount whatsoever * * * shall be directly or indirectly charged, contracted for or received, except *insurance premiums and any gain or return to the licensee therefrom* * * *. (Emphasis supplied.)

P.L. (Me.) 1963, c. 141, § 3-A. For the most recent amendment to Section 3082, see P.L. (Me.) 1967, c. 473, § 4 (July 5, 1967).

surance Law that in endeavoring to provide an effective regulatory system, the Maine Legislature delineated distinct areas of responsibility for the insurer and for the creditor. Thus, Section 1207 imposes upon the *insurer* the responsibility of filing all policy forms and premium rates with the Insurance Commissioner for his approval, and Section 1208(1) provides that:

> No *insurer* shall issue any credit life insurance policy or credit accident and health insurance policy for which the premium rate exceeds that determined by the schedules of such *insurer* as then on file with the commissioner. (Emphasis supplied.)

On the other hand, in Section 1208(4) the statute speaks to the *creditor* in the following language:

> The amount charged to a debtor for any credit life or credit health and accident insurance shall not exceed the premiums charged by the insurer, as computed at the time the charge to the debtor is determined.

The statutory scheme leaves no doubt as to the legislative intent. The Legislature enjoined the *insurer* from charging an unauthorized premium, and the *creditor* from charging more than the premium charged by the *insurer*. Significantly, the Legislature did not impose on the *creditor* responsibility for an unauthorized premium charged by the *insurer*. Had the Legislature intended to attribute to the creditor accountability for the sins of the insurer, it could have easily said so.

 In summary then, so long as the creditor's insurance charge to the debtor does not exceed the premium charged to the creditor by the insurer, the express language of Section 1209 excludes such an insurance charge from the ambit of the Small Loan Law, a result which is entirely consistent with the manifest intent of the Legislature in enacting the Credit Insurance Law. If the regulatory system thus prescribed by the statute has proved to be ineffective in preventing abuses in the issuance of credit insur-

ance, it is for the Maine Legislature, and not this Court, to enact appropriate remedial legislation.

 For the reasons stated, the Court holds that Aetna's loan to the debtors in this case was not rendered void under the Maine Small Loan Law simply because the charge to the debtors for credit insurance was in excess of any premium which Old Republic was authorized to charge under the Maine Credit Insurance Law.

## II

The referee's alternative ruling is based upon his conclusion that Section 656 (b) of the Bankruptcy Act was applicable in this case and imposed upon Aetna the burden of proving that its claim was free from usury. Thus, the referee stated:

> referees in bankruptcy in wage earner proceedings are compelled by a specific act of Congress to demand "proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt was contracted." Section 656(b) of the National Bankruptcy Act of 1898; 11 U.S.C. § 1056(b).

and

> under any reasonable interpretation of Section 656(b) of the Bankruptcy Act, it was incumbent upon Aetna to present the master policy in a proper manner and submit an accounting of the disposition of the insurance premium to establish that it did not in any way improperly profit from the transaction by remitting to the insurance company only a portion of the premium which it had exacted from the borrower. However, although such information was exclusively within its possession, Aetna deliberately refrained from introducing such material and accordingly failed to sustain its burden that it did not retain any portion of the premium and thereby illicitly receive compensation in addition to the maximum interest on the loan transaction.

Accordingly, the referee concluded that "Aetna failed to sustain its burden in

proving that the claim is free from usury."

As has been noted,[14] none of the evidence presented at the hearing, either by Aetna or by the trustee, established whether the amount charged by Aetna to the debtors for credit insurance was the same as, or greater than, the premium charged by Old Republic to Aetna, and the referee made no finding in this respect.[15] It was only by invoking Section 656(b) of the Bankruptcy Act to impose upon Aetna the burden of establishing that it did not improperly profit from the transaction that the referee arrived at his ultimate conclusion that Aetna's loan was usurious and void.[16]

■ However, Section 656(b) plainly had no application in this case. It provides that:

> *Before confirming any such (wage earner) plan* the court shall require proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt was contracted. (Emphasis supplied.)

Clearly, whatever Section 656(b) may require when timely invoked,[17] it is applicable only *before confirmation.* In this case the wage earner plan was confirmed by the referee immediately following the first meeting of creditors on December 26, 1963. It was not until two years *after confirmation* that the referee invoked the provisions of Section 656(b) to disallow Aetna's claim. His attempt to do so at that late date is precluded by the express limitation contained in the statute itself.

■ In conclusion then, the Court is persuaded that the referee erred in invoking Section 656(b) of the Bankruptcy Act to impose upon Aetna the burden of establishing that its claim was free from usury. Since under established principles usury is ordinarily not presumed, Armstrong v. Alliance Trust Co., 88 F.2d 449, 452 (5th Cir.1937),[18] the burden was on the trustee, as the objecting party, to assert and prove the existence of usury in Aetna's claim.[19] As previously stated, the trustee has not carried that burden in this case.

14. See supra n. 6 and its accompanying text.

15. It is interesting (and possibly significant) that when Aetna attempted to offer in evidence a copy of the master policy, the trustee objected on the ground that the copy was not properly authenticated. The referee quite properly sustained the objection, and at Aetna's request the hearing was continued so that Aetna might produce an officer of Old Republic as an authenticating witness. However, at the continued hearing Aetna did not again offer the master policy.

16. Implicit in this conclusion of the referee is his apparent assumption that any profit realized by a creditor from the issuance of credit insurance constitutes a violation of Section 1208(4) of the Credit Insurance Law and results in the exaction of a "further or other charge or amount" prohibited by Section 3082 of the Small Loan Law. Certainly, this is a highly questionable proposition in light of Section 1207(2), which requires the Insurance Commissioner to consider, in approving premium rates for credit insurance, "cost and compensation to the creditor," and Section 1209, which provides

that: "any benefit or return or other gain or advantage to the creditor arising out of the sale or provision of such insurance shall not be deemed a violation of any other law, general or special, of the State of Maine."

17. See opinion filed this date In re Perry, 272 F.Supp. 73 (D.Me.1967).

18. In fact, there is a strong presumption in favor of the legality of a transaction and the absence of usury. Armstrong v. Alliance Trust Co., supra; In re Mansfield Steel Corp., 30 F.2d 832, 833 (E.D. Mich.1929); In re Zemansky, 39 F.Supp. 628, 630 (S.D.Cal.1941). As the Supreme Court said in Houghton v. Burden, 228 U.S. 161, 172, 33 S.Ct. 491, 494, 57 L.Ed. 780 (1913), "Usury is a crime and he who alleges it as a defense to an obligation must establish it by clear and satisfactory evidence." The law of Maine appears to be in accord with this general view. Warren v. Coombs, 20 Me. 139, 143 (1841).

19. The position of a trustee in bankruptcy who raises usury as an objection to the allowance of a creditor's claim is no different from that of a debtor who asserts usury as an affirmative defense in an

The order of the referee disallowing the claim of Aetna Finance Company of Maine filed in these proceedings is reversed, and the matter is remanded to the referee for further proceedings not inconsistent herewith.

It is so ordered.

action brought by the creditor for recovery of the loan. 3 Collier, Bankruptcy, para. 57.18(5) at 271 (14th ed. 1966); Matter of Lynch, 8 Am.Bankr.R. (n. s.) 858, 865–67 (Ref.N.D.W.Va.1926). As the court stated in In re Miller, 21 F. Supp. 644, 645 (S.D.N.Y.1937), "By objecting to the claim, the trustee is in the same position as one pleading an affirmative defense to an action at law. * * * The burden of proof of sustaining the affirmative defense of usury was upon the trustee."