Gerald S. COPE, Trustee, et al., Appellants,

v.

AETNA FINANCE COMPANY OF MAINE, Appellee.

In the Matter of Robert R. RICHARDS et al., Debtors.

No. 7214.

United States Court of Appeals
First Circuit.

Heard Jan. 9, 1969.

Decided May 21, 1969.

As Amended on Denial of Rehearing
June 24, 1969.

Charles W. Smith, Saco, Me., with whom James R. Flaker, Gerald S. Cope, Portland, Me., and George P. Limberis, Bangor, Me., were on brief, for appellants.

John J. Flaherty, Portland, Me., with whom Edward L. Caron, Biddeford, Me., and Berman, Berman. Wernick & Flaherty, Portland, Me., were on brief, for appellee.

Before ALDRICH, Chief Judge, Mc-ENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from the district court's order allowing the claim of appellee, Aetna Finance Company of Maine, in proceedings under Chapter XIII of the Bankruptcy Act. In re Richards, 291 F. Supp. 537 (D.Me.1968).

The facts are clearly set forth in an earlier order by the district court, In re Richards, 272 F.Supp. 480 (D.Me.1967), and are summarized as briefly as possible hereafter. On December 7, 1963, the debtors, Robert R. and Gail L. Richards, filed petitions for wage earner plans under Chapter XIII of the Bankruptcy Act. In the schedules attached to their petitions, the debtors listed a debt to appellee in the amount of $957.22, secured by a chattel mortgage on household goods, with the notation that the debt was disputed as being in violation of the Maine Small Loan Law.[1]

At the first meeting of creditors appellee presented a proof of claim for $957.22 to which was attached a copy of the note, the chattel mortgage, ledger cards of the transaction, and an affidavit of Aetna's local manager that to the best of his knowledge and belief "no usury has been charged said debtors on said account." The referee continued the question of the validity of Aetna's claim for later determination, and proceeded to enter an order declaring the plan accepted, appointing a trustee and confirming the plan.

On December 22, 1964, one year after confirmation of the plan, the trustee for the first time filed formal objections to Aetna's claim. Finally, on June 29 and July 9, 1965, hearings on the validity of Aetna's claim were held before the referee.

The evidence presented at the hearing disclosed that the debtors borrowed money from Aetna on two occasions—March 4, 1961, and July 2, 1962. On the second occasion the debtors signed a note in the face amount of $1,174.73 [2] which provided for payment of maximum interest under Maine law. The note also included credit health and accident, and life insurance premiums of $151.16.

The referee found that the debtors were charged an amount for credit insurance which was in excess of any amounts authorized to be charged for credit insurance under the Maine Credit Insurance Law, 24 M.R.S.A. §§ 1201–1214 (1964). The referee then concluded that Aetna's loan was void under the Small Loan Law and he disallowed the claim. The basis of the referee's order was twofold: (1) that the amount charged was unauthorized; and (2) that Aetna had failed to establish that its claim was free from usury as required by § 656(b) of the Bankruptcy Act, 11 U.S.C. § 1056(b) (1964).[3]

The district court, on July 20, 1967, reversed the referee's order on both points.

1. The Maine Small Loan Law, formerly 9 M.R.S.A. § 3082, provided in part that: "In addition to the interest herein provided for, no further or other charge or amount whatsoever for any examination, service, brokerage, commission or other thing, or otherwise, shall be directly or indirectly charged, contracted for or received, except lawful fees, if any, actually and necessarily paid out by the licensee to any public officer * * *. If interest or charges in excess of those permitted * * * shall be charged, contracted for or received, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges whatsoever."

2. Aetna's records disclosed that the note was comprised of the following items:

| Payment of unpaid principal | |
|---|---|
| on prior loan | $856.99 |
| Recording fee | 10.00 |
| Insurance premium | 151.16 |
| Cash to borrowers | 165.58 |
| Total | $1,174.73 |

3. § 656(b) of the Bankruptcy Act, 11 U.S.C. § 1056(b) provides that: "Before confirming any such [wage earner] plan the court shall require proof from each creditor filing a claim that such claim is free from usury as defined by the laws of the place where the debt was contracted."

First, it held that the section of the Maine Credit Insurance Law dealing with authorized premiums, § 1208(1), was directed at insurers and did not impose any responsibility on the creditor for an unauthorized charge.[4] Secondly, the district court held that § 656(b) was applicable only *before* confirmation and hence could not be invoked with respect to Aetna's claim.[5]

Upon remand, with the district court sitting in place of the referee, evidence was presented to determine whether Aetna had charged the debtors an amount in excess of the premium charged it by the insurer.[6] The district court found that Aetna had not in fact charged the debtors more than the amount charged Aetna by the insurer. It also concluded that even had Aetna charged the debtors more than it had been charged, there would have been no violation of the Maine Small Loan Law because of the exemption granted by § 1209 of the Maine Credit Insurance Law.[7] The district court then allowed Aetna's claim in full. 291 F. Supp. 537 (D.Me.1968).

▮▮▮▮ Before proceeding to the merits of this appeal, we must first consider the contention made by appellee that the ruling of the district court on July 20, 1967 declaring inapplicable § 1208(1) of the Credit Insurance Law is not appealable by virtue of the time limitation of § 25(a) of the Bankruptcy Act.[8] Appellee's position is that the July 20, 1967 order was rendered in "proceedings in bankruptcy" and hence was appealable whether interlocutory or final. We are inclined to agree that the case is one of "proceedings in bankruptcy" within the meaning of §§ 24(a) and 25(a).[9] How-

---

4. § 1208(1) of the Maine Credit Insurance Law provides that:

   "1. Rates filed. Any insurer may revise its schedules of premium rates from time to time, and shall file such revised schedules with the commissioner. No insurer shall issue any credit life insurance policy or credit accident and health insurance policy for which the premium rate exceeds that determined by the schedules of such insurer as then on file with the commissioner."

5. Since our decision does not in any way turn on the application of § 656(b), we pass this issue.

6. § 1208(4) of the Maine Credit Insurance Law provides that:

   "The amount charged to a debtor for any credit life or credit health and accident insurance shall not exceed the premiums charged by the insurer, as computed at the time the charge to the debtor is determined."

7. § 1209 of the Maine Credit Insurance Law provides that:

   "All policies of credit life insurance and credit accident and health insurance shall be delivered or issued for delivery in this State only by an insurer authorized to do an insurance business therein, and shall be issued only through holders of licenses or authorizations issued by the commissioner. The premium or cost of such insurance when issued through any creditor shall not be deemed interest, or charges, or consideration, or an amount in excess of per-

mitted charges in connection with the loan or other credit transaction, and any benefit or return or other gain or advantage to the creditor arising out of the sale or provision of such insurance shall not be deemed a violation of any other law, general or special, of the State of Maine. The insurance premium or other identifiable charge for such insurance may be collected from the insured or included in the finance charge or principal of any loan or other credit transaction at the time such transaction is completed."

8. § 25(a) of the Act (before July 1, 1968) required that appeals be taken within thirty days after written notice of the entry of the judgment or order. § 24(a) of the Act provides that in "proceedings in bankruptcy" appeals may be taken from either interlocutory or final orders while in "controversies in bankruptcy" appeals may be taken only from final orders. Dutch American Merc. Corp. v. Eighteenth Avenue Land Co., 302 F.2d 636 (2d Cir. 1962).

9. We recognize that the distinction between "proceedings" and "controversies" is often obscure. In re Imperial "400" National, Inc., 391 F.2d 163, 168 (3d Cir. 1968). Nevertheless, it is true, as a general proposition, that "controversies include" primarily disputes between the trustee and third parties over title to property in the bankrupt estate. And it is not true, as appellant suggests. that the fact that appellee's claim purports to be secured

ever, such a conclusion would not be dispositive of the question presented.

■■ Not every interlocutory order entered in bankruptcy is appealable. At a minimum an order must represent a formal exercise of judicial power deciding some step in the proceedings. *See generally*, 2 Collier on Bankruptcy ¶ 24.39. *See, e. g.*, Hoehn v. McIntosh, 110 F.2d 199, 200 (6th Cir. 1940); Matter of Haytian Corp. of America, 112 F.2d 146 (2d Cir. 1940).[10] The critical question is whether the July 20, 1967 order was determinative of the rights of the parties. We conclude that it was not. While the district court did resolve certain issues against appellant, it did not allow or disallow appellee's claim.[11]

We therefore hold that this court may consider issues involved in the July 20, 1967 order. This approach not only reflects the sound policy of discouraging piecemeal litigation but particularly accords with the context out of which this case arose—something of a test case in which the court has painstakingly tried to move, step by step, to narrow the issues without foreclosing eventual appeal rights of the unsuccessful party.

We come at last to the merits of this elusive case. Its elusiveness—apart from its arcane procedural issues—arises from the application of two regulatory statutes, the Small Loan Law and the Credit Insurance Law, to a rather extraordinary factual situation. The half century old Small Loan Law, *see* n. 1, contains a stark, blanket proscription against a creditor imposing on a debtor any "other charge or amount whatsoever" in addition to interest. If excess charges are made, "the contract of loan shall be void". The Credit Insurance Law was enacted in 1961 and was designed to provide comprehensive regulation of the sale of credit insurance. It expressly permits the lender to require a debtor to obtain credit insurance as a precondition to a loan, and the lender is permitted by § 1209 to market the insurance without running afoul of the provisions of the Small Loan Law. In return for these privileges, the law also imposes certain obligations on the insurer and the lender. Section 1208(1) enjoins the insurer from charging premiums in excess of those authorized by the Maine Insurance Commission. Section 1208(4) prohibits a lender from charging the debtor more than the lender was charged by the insurer. Section 1214 empowers the Maine Insurance Commissioner to impose sanctions for violations of his orders, ranging from civil penalty to revocation of license.

In the ordinary situation, where an insurer establishes a premium rate conforming to the requirements of § 1208

---

brings the case within the "controversies" language. It is well settled that where a lien is asserted in conjunction with a contested claim the proceedings are "proceedings in bankruptcy" within the meaning of § 24(a). *See* 2 Collier on Bankruptcy, ¶ 24.19, cases cited n. 13.

10. Our review of representative authorities for the proposition that, if appeal from an interlocutory order is available, it is mandatory, reveals that in each case the district court had entered an order determinative of a step in the proceedings. *See, e. g.*, In re Irving-Austin Bldg. Corp., 96 F.2d 905 (7th Cir. 1938) (order of classification in reorganization proceedings); In re Kest, 78 F.2d 705 (2d Cir. 1935) (order of allowance of claim); Marcy v. Miller, 95 F.2d 611 (10th Cir. 1938) (order dismissing composition petition as to two creditors); Peterson v. Baker, 168 F.2d 684 (8th Cir. 1948)

(order removing certain assets from proceedings); Namoff v. Hyland Electrical Supply Co., 275 F.2d 14 (7th Cir. 1960) (denial of jury trial).

Our own decision in Gorbea v. Soto Gras, 82 F.2d 634 (1st Cir. 1936) is simply inapposite to this appeal. In that case, decided before the 1938 amendments to the Bankruptcy Act, the order was appealable only in the discretion of the court of appeals and appellant had not petitioned this court within 30 days of the entry of the order.

11. See Buffum v. Maryland Cas. Co., 77 F.2d 761 (9th Cir. 1935). In *Buffum, supra*, the district court reversed the referee's rejection of a claim and remanded the case to the referee to determine the amount of the claim. The Ninth Circuit held that the district court order was not reviewable.

(1), and where the creditor merely passes on the premium so charged to the borrower in accordance with § 1208(4)— even though the premium may include some amount for "cost and compensation to the creditor" under the authority of § 1207(2),[12] there is no problem of violation of the Small Loan Law. There might even be no problem for the creditor if the insurer imposed on it a higher than authorized premium charge. The district court may well be correct in saying that such an infraction of the Credit Insurance Law is solely within the sanctioning power of the Insurance Commissioner and that § 1208(1) does not "attribute to the creditor accountability for the sins of the insurer." 272 F.Supp. at 487. We agree that the statutory scheme of the Credit Insurance Law clearly distinguishes between the obligation of the insurer and that of the creditor. The underlying assumption is that separate entities, making separate and independent decisions, shall be separately responsible for decisions within their sphere of responsibility.

The case before us, however, is not the ordinary situation contemplated by the statute. In this case the court observed "that this record reveals abuses on the part of the lenders and insurers involved which cry out for immediate and effective regulatory action." 291 F.Supp. at 541. Footnoting this observation was the finding: "There can be little doubt on this record that Aetna of St. Louis, American Universal and Old Republic acted jointly to fix premium rates to be charged Aetna debtors which would provide a substantial profit to American Universal as reinsurer." 291 F.Supp. at 541, n. 10.

The interrelationship of the various parties relevant to this finding is pertinent to our decision. Aetna of Maine was a wholly-owned subsidiary of Aetna of St. Louis, with the same officers and directors. The latter also was the sole owner of American Universal Life Insurance Company of St. Louis, which shared at least some of the officers and directors of Aetna of St. Louis. Old Republic was a large, independent credit insurance company, Aetna of St. Louis being one of some 750 accounts.

Old Republic, having a license to issue insurance in Maine, which American Universal lacked, also had the benefit of knowledge of insurance laws in the various states, the ability to devise and supply appropriate forms, rate charts, and policies, and useful actuarial and legal competence. It was these services that Old Republic largely supplied, its insurance risk being completely covered by American Universal under reinsurance treaties.[13]

Despite deposition testimony of a former employee of Old Republic that rates were fixed solely by Old Republic, the record indicates that Old Republic, after compiling rates which would produce various loss ratios, looked to American Universal to pick the loss ratio it desired. The life insurance premium chosen was at the rate of $1.00 per hundred of outstanding indebtedness a year, although expert testimony indicated that the "commonly prevailing rate" at the time throughout the country was less than half as much and Aetna had previously

12. Section 1207(2) of the Credit Insurance Law directs the Insurance Commissioner, in determining whether to disapprove a proposed rate, to give "due consideration to * * * general administrative expenses, including handling cost for return premiums, commissions to agents, cost and compensation to the creditor, branch and field expenses * * *."

13. Old Republic issued a master policy to Aetna of St. Louis, covering borrowers of Aetna of Maine. It retained about 10 per cent of premiums for its services, sending the balance to American Universal which processed and paid all claims. Premiums charged to borrowers were deducted from the proceeds of the loan at the time of the loan transaction, forwarded by Aetna of Maine to Aetna of St. Louis, thence to Old Republic, which then made periodic remittances to American Universal. American Universal processed claims and paid them by drafts drawn on Old Republic, which then deducted such amounts from its remittances to American Universal.

paid for coverage of its Maine borrowers at a cost of approximately 50 cents a hundred. American Universal showed a before-tax net income of $1.4 million on total 1962 premium income of $2.2 million, or 63 per cent.[14] Its net income attributable to sales of credit insurance in Maine was $59,647.68.

■ Under these circumstances, the district court's finding that Aetna of St. Louis, American Universal, and Old Republic jointly fixed the premium rate has in reality made irrelevant the literal application of §§ 1208(1) and (4). For here, instead of an "insurer" unilaterally establishing a rate and a "lender" merely passing it on to a borrower, Aetna of St. Louis and American Universal, the parent and sister, respectively, of Aetna of Maine, participated in the making of both decisions. Indeed the situation is in essence as if Aetna of St. Louis had commanded its wholly-owned insurance subsidiary to set a rate and its own wholly-owned loan company to pass it on. For all practical purposes, the lender is setting the rate under the guise of insurer. Not only this, but there is a possibility, which we discuss *infra*, that the rates so fixed were unauthorized. Were this to be proven, we would see no difference between such a situation and one where Aetna of Maine added a charge to the premium and passed it on to the borrower. The fact that Aetna of St. Louis could so control the setting of the original premium that there was no necessity of Aetna of Maine's taking the second step of adding to it cannot be a basis for different legal consequences. We would not easily believe that the Maine Legislature intended to permit any such facile evasion of the regulatory scheme of the Credit Insurance Law. Assuming that the premiums were unauthorized, therefore, we would hold that Aetna of Maine, despite the surface appearance of compliance with § 1208(4), in reality violated it because of its complicity in the centralized decision making which rendered § 1208(4) irrelevant.[15]

The district court held that even if there had been a violation of § 1208(4), there would be no violation of the Small Loan Law since § 1209 of the Credit Insurance Law "removes from the ambit of Section 3082 of the Small Loan Law not only the credit insurance premium, but also any profit received by a lender from a credit insurance transaction." 291 F.Supp. at 541. This proposition we now examine.

■ We begin with certain specific and general guidelines for construction. The Credit Insurance Law itself, § 1201, advises that its purpose is "to promote the public welfare" and, more specifically, that "Nothing in this subchapter is intended to prohibit or discourage reasonable competition. This subchapter shall be liberally construed." We then accept as relevant general objectives (1) that the Credit Insurance Law be so construed as to effectuate its purposes; (2) that its exculpatory clauses be narrowly construed; (3) that it be so construed as to effect no unnecessary erosion of the Small Loan Law; and (4) that it be so construed as to be internally consistent.

■ Coming to the Credit Insurance Law itself, and reviewing it as a rational regulatory system, we cannot say that the Maine Legislature intended in § 1208 (4) to prevent creditors from adding on to the premium charge and, in the fol-

---

14. As the district court observed, "The circumstances of this case thus provide a graphic illustration of the economic phenomenon of 'reverse competition', a long deplored feature of credit insurance transactions in many states." 291 F.Supp. at 541, n. 10. That is, instead of incentive on the part of sellers of insurance to minimize prices, the captive status of the small loan customer and the prevalence of insurance companies affiliated with lenders provide an incentive to maximize the gain from credit insurance, the premium not being a cost to the lender but an opportunity for profit for the lender's affiliate.

15. We note also that the Maine Legislature was not oblivious to the problems posed by distinguishable corporate entities. In § 1202(2) (C), it defined "creditor" as "The lender of money * * * and an affiliate".

lowing section, § 1209, to exempt them from all liability for so doing. Such an interpretation of "any benefit * * * to the creditor * * * shall not be deemed a violation" would eviscerate and render meaningless § 1208(4). Furthermore, to read § 1209 as giving a creditor violating § 1208(4) immunity from the usury sanction of the Small Loan Law would fly in the face of § 1214. This is the penalty section of the Credit Insurance Law and commences with the words, "In addition to any other penalty provided by law". Without this language we would hesitate to conclude that the Legislature intended to exempt from the usury penalty creditors who might resort to the premium-add-on route; with this language, we deem it impossible to conclude that the Legislature carved out any exemption larger than was necessary for the purposes of a regulated credit insurance system.

Section 1209 can be reasonably interpreted to fit within the concept of a limited rather than an unconditional exemption from the usury statute. Its first sentence requires all credit insurance policies to be delivered or issued by and through holders of licenses or authorizations. The subject of the second sentence—that which is "not [to] be deemed interest or charges * * * in excess of permitted charges" etc.—is "the premium or cost of such insurance". Since § 1208(1) proscribes the issuance of policies for rates in excess of the schedules on file with the Insurance Commissioner, we can reasonably assume (if indeed we are not forced to assume) that

the premiums referred to are those legitimized by the Commissioner. This construction seems to us to be the only one consistent with the statutory purpose of promoting of public welfare and the guidelines of encouragement of reasonable competition and of liberal construction.

The second sentence has two parts. The first declares that "premium or cost of such insurance * * * shall not be deemed * * * an amount in excess of permitted charges in connection with the loan." The second part adds that "any benefit or return * * * to the creditor * * * shall not be deemed a violation of any other law, general or special, of the State of Maine." The first part refers clearly, though not explicity, to the Small Loan Law. The second part is less clear. Arguably, "any other law" is a reference to laws other than the Small Loan Law, such as the laws governing the incorporation of small loan and insurance corporations. *See, e. g.,* 24 M.R.S.A. § 375; 24 M.R.S.A. § 501. If, however, the reference is to the Small Loan Law, the " 'any benefit or return' " referred to is not reasonably to be construed as carte blanche for the creditor but rather as any benefit or return from either an authorized premium or from an unauthorized premium for which the creditor is not responsible under § 1208 (4) of the Credit Insurance Law.[16]

A word remains to be said about the action of the Maine Legislature in adopting the language of the second sentence of § 1209 in preference to language sug-

---

16. In the 1967 amendments to the Small Loan Law, 9 M.R.S.A. § 3082, the Maine Legislature adopted essentially the analysis we pursue in this appeal. Originally, the Small Loan Law prohibited all "other charges" except lawful filing fees. Section 1209 of the Credit Insurance Law was enacted in 1961, and in 1963 the Small Loan Law was amended so as to remove from "other charges":
　"* * * insurance premiums for group life insurance and group accident and health insurance and any gain or return to the licensee therefrom * *."

In 1967 the Small Loan Law was again amended to provide that:
　"If interest or charges in excess of those permitted by this section and section 3081, including insurance premiums and filing fees, shall be charged * * * the contract of loan shall be void * *."
It is clear that insurance premiums can be " * * * in excess of those [charges] permitted by this section" only if the 1963 amendment is restricted in coverage to lawful premiums. Any other interpretation of the 1963 amendment would render the Small Loan Law internally contradictory.

gested by the Model Credit Insurance Act. The district court in its first opinion, In re Richards, 272 F.Supp. 480 at 485 n. 11 (D.Me.1967), said:

> "Significantly, the second sentence of Section 1209 as quoted above was not a part of the NAIC model act. In this respect, the model act suggested that if a state prohibited payments for insurance by the debtor in connection with a credit transaction, the following provision might be included: 'Nothing in this Act shall be construed to authorize any payments for insurance now prohibited under any statute, or rule thereunder, governing credit transaction.' See Vol. 1, 1961 Proceedings, National Association of Insurance Commissioners, p. 304."

In its second opinion, 291 F.Supp. at 541, it added:

> "Had the Maine Legislature, in enacting the Credit Insurance Law, wished to subject lender *profit* from credit insurance transactions to the stern proscriptions of the Small Loan Law, it could have enacted something similar to the provision of the Model Credit Insurance Act which was rejected and replaced by Section 1209."

A close reading of the excerpt from the first opinion reveals that the court's conclusion in the second opinion lacks logical linkage. For the suggested language in the model act was appropriate *only in those states* which "prohibited payments for insurance by the debtor". It was a sweeping provision which would have negated the entire intent of the Maine Legislature in legitimizing regulated credit insurance transactions in which the borrower was expected to pay the premium. It had a much broader focus than lender profit. Its rejection by the Maine Legislature does not, we think, detract from our analysis.

We hold, therefore, that if the rates nominally set by Old Republic, but in reality fixed jointly with the lender's parent which shared in the profits, were in fact in excess of those authorized at the time, Aetna's claim must be disallowed.

Unfortunately, we are not clear whether the rates were unauthorized. We say this despite the clear statement of the district court that:

> "It is not seriously disputed that the credit life insurance premium of $35.24 and the credit health and accident insurance premium of $115.92 charged these debtors were substantially in excess of the maximum premiums authorized to be charged for such insurance under the then applicable provisions of the Maine Credit Insurance Law." 291 F.Supp. at 539.

The credit life insurance rate of $1.00 per hundred dollars of indebtedness, established on December 31, 1961, clearly exceeded the 64 cents rate subsequently established by Bulletin No. 92 of the Maine Insurance Commission. But a "grandfather clause" in § 1207(6) of the Credit Insurance Law provides for the continuance of one year of rates under policies delivered in Maine before September 16, 1961. The first master policy delivered by Old Republic to Aetna of St. Louis was never introduced into evidence. We do not know the dates or the details of its contents.[17]

The rate for credit health and accident insurance, on a three day retroactive basis (i. e., paying benefits from the first day of disability if the disability exceeded three days), was established by a rider to the master policy in May of 1962 and backdated to December 31, 1961. We do not know whether this rate, a new one, took on legitimacy from the fact of the prior existence of the master policy.

We can with certainty read the court's conclusion as meaning merely that the rates set by Old Republic exceeded the

---

17. The appellant contends that the premium rate charged the debtors was in excess of the premium rate in the master policy thereby resulting in an add-on in violation of § 1208(4). Since the master policy was not introduced in evidence, we are unable to deal with this issue. Whether there is any substance to appellant's claim is a matter for the district court on remand.

rates subsequently established by the Maine Insurance Commission. It may well be that the district court considered the grandfather clause and retroactivity issues in concluding as it did. In this event we shall need specific findings. In any event we decree that this case be remanded for further proceedings consistent with this opinion.

Remanded for further proceedings consistent with this opinion.